[This opinion has been published in *Ohio Official Reports* at 80 Ohio St.3d 670.]

THE STATE OF OHIO, APPELLEE, *v*. REYNOLDS, APPELLANT.

[Cite as *State v. Reynolds*, 1998-Ohio-171.]

*Criminal law—Aggravated murder—Death penalty upheld, when.*

(No. 96-1956—Submitted September 23, 1997—Decided January 14, 1998.)

APPEAL from the Court of Appeals for Summit County, No. 16845.

_____

{¶ 1} Appellant, Lawrence Reynolds, Jr. ("Reynolds"), was convicted of the aggravated murder of Loretta Foster. He appeals his convictions and death sentence.

{¶ 2} In early January 1994, Foster complained to her son that a neighbor, Reynolds, had been knocking on her door after dark. Reynolds had recently painted Foster's basement and claimed that he needed to put a paint can in the basement. Foster told her son that she was scared of Reynolds.

{¶ 3} On January 11, 1994, Foster's sister-in-law, Norma Haubert, took her to a doctor's appointment. Foster told Haubert that a neighbor had been acting "weird"; that is, he would knock on the door, hide, and then jump out at her. Foster told her doctor and her doctor's office manager about Reynolds in an effort to explain why her blood pressure was elevated. After the visit to the doctor, Foster stopped at her credit union and withdrew fifty dollars. Haubert dropped Foster off at home around 3:00 p.m.

{¶ 4} Around 7:30 p.m. that evening, Reynolds and his brother Jason went to Northgate Lanes to shoot pool with Jason's friend Joseph Hindel. Upon arriving, Reynolds told Brian Baker and Jim Ferrando that that would be his last night to party with them because he had killed someone and was leaving town the next day.

{¶ 5} Reynolds told them that he had knocked on Foster's door and told her that he had something to give her from his sister. He had rope and a tent pole with

him. Foster opened the door and a struggle began. Reynolds hit Foster and she fell to the floor. He began to rummage through her purse. When he realized she was attempting to reach for the phone, he cut the phone line, "tied her up," and hit her once or twice with the tent pole. He tried to strangle her with his hands, but was unsuccessful.

{¶ 6} At some point during the struggle, Reynolds received a rope burn on his hand, which he showed his listeners. Reynolds told them that he had left Foster lying naked in the living room, and that he had taken forty dollars in cash and a blank check from her checkbook before leaving through the back door.

{¶ 7} The group proceeded to the Rainbow Bar where Reynolds continued to discuss how he had killed Foster. Baker and Ferrando did not know whether to believe Reynolds, so they left the bar and went to Foster's house. They looked into the living room window and saw Foster's nude body lying on the floor.

{¶ 8} Reynolds and Jason also went to Foster's house after leaving the Rainbow Bar. Jason was stunned to see Foster's body. Reynolds picked up a glove and a tent stake that he had left and attempted to brush off the purse. Then they returned to their home.

{¶ 9} Baker and Ferrando went to a friend's house because they knew his father was a police officer. They told Officer Joe Orsine what Reynolds had told them and described what they had seen at Foster's house. They later went to the police station and made a statement.

{¶ 10} Police officers were dispatched to investigate. After finding the victim's body, the police initiated a homicide investigation and obtained an arrest warrant for Lawrence Reynolds, Jr.

{¶ 11} Officers went to the Reynolds home and arrested Reynolds. While the officers were there, Lawrence Reynolds, Sr. consented, verbally and in writing, to a search of the house. He specifically consented to a search of Reynolds's

2

bedroom and the basement. Police seized a camouflage outfit, gloves, a tent pole, white rope, a knife, and a blank check.

{¶ 12} Forensic tests revealed that the rope found in Reynolds's bedroom matched the rope used to tie up Foster. Human hair on the rope matched a hair sample taken from Foster. Blood found on the camouflage overalls was of the same type as Foster's.

{¶ 13} On January 20, 1994, the Summit County Grand Jury indicted Lawrence Reynolds, Jr. for one count of aggravated murder committed during the course of a robbery and/or burglary and/or kidnapping and/or attempted rape. Four separate aggravating circumstances, pursuant to R.C. 2929.04(A)(7), were alleged, *i.e.*, murder during an aggravated robbery, murder during an aggravated burglary, murder during a kidnapping, and murder during an attempted rape. Reynolds was also charged with four separate felonies—aggravated robbery, aggravated burglary, kidnapping, and attempted rape.

{¶ 14} While awaiting trial in the Summit County Jail, Reynolds told an inmate, Neil Webster, the same story he had told his friends. Reynolds also stated that he had taken off Foster's blouse to enable him to see her hands at all times. Webster questioned him concerning a newspaper article that asserted that the victim was found with her pants off. Initially, Reynolds claimed that Foster's pants had come off in the struggle, but he later told Webster that "he tried to stick his meat in her." When Webster specifically questioned him, Reynolds denied trying to rape Foster.

{¶ 15} The autopsy showed that Foster had been strangled. She had also been subjected to blunt force trauma. No evidence of spermatozoa was found in her vagina or rectum, and there was no physical evidence of sexual conduct.

{¶ 16} At trial, the defense did not deny that Reynolds was responsible for Foster's death. Instead, the defense attacked various elements of the offenses

charged and attempted to show that Reynolds had been drunk and had not gone to Foster's house intending to kill her.

{¶ 17} Reynolds was twenty-seven years old when the crime was committed and had been drinking alcohol since he was approximately fourteen years old. During his high school years, he drank as many as twelve cans of beer a day. Despite this drinking, Reynolds apparently had a normal childhood in a middle class family. After high school, he enlisted in the Army for four years and then re-enlisted for two more years. He served in Korea for eighteen months and was often drunk when he telephoned home.

{¶ 18} When he got out of the Army, he became depressed because his girlfriend and the son he had fathered with her did not come to Ohio with him. His aunt and uncle helped him get a job with a replacement window company. He worked there for about two years before being fired because of alcohol-related chronic tardiness and absenteeism.

{¶ 19} Approximately two years before the murder, Reynolds had been arrested for driving under the influence and failing to comply with a police officer's order. He moved in with his parents and completed an alcohol treatment program. Even so, he continued to drink. He paid rent to his parents when he first moved home, but had not given them any rent for about four months prior to Foster's death. He had been unable to find a job and sold personal items to support his drinking habit. When he had nothing left to sell, he apparently decided to steal money from Foster.

{¶ 20} The jury found Reynolds guilty of all charges and recommended the death penalty. The trial court adopted the jury's recommendation and sentenced Reynolds to death. The court of appeals affirmed the convictions and sentences.

{¶ 21} The cause is now before this court upon an appeal as of right.

_____

*Maureen O'Connor*, Summit County Prosecuting Attorney, and *Philip D. Bogdanoff*, Assistant Prosecuting Attorney, for appellee.

*Burton & Merlitti* and *Lawrence J. Whitney;* and *Renee W. Green*, for appellant.

_____

**PFEIFER, J.**

{¶ 22} In this appeal, Reynolds advances nineteen propositions of law. For the reasons that follow, we reject all his propositions of law and affirm each conviction and the death sentence.

*Ineffective Assistance of Counsel*

{¶ 23} In his first proposition of law, Reynolds contends that he was denied the effective assistance of counsel because his lead attorney was appointed to represent him only two weeks prior to trial. Sup.R. 20 (formerly C.P.Sup.R. 65) provides that two attorneys, certified pursuant to the rule, must be appointed to represent indigent persons charged with a capital crime. One attorney is designated lead counsel and the other is designated co-counsel. The Committee on the Appointment of Counsel for Indigent Defendants in Capital Cases certifies attorneys as either lead or co-counsel, based on training and experience. One of the attorneys appointed to an indigent capital defendant must be certified as lead counsel.

{¶ 24} Attorneys George Keith and George Pappas were appointed to represent Reynolds. After pretrial motion hearings, but before the trial began, the trial court discovered that neither attorney was certified as lead counsel. Keith moved to withdraw from the case and requested that an attorney certified as lead counsel be appointed. The trial court appointed Kerry O'Brien, a lead-counsel certified attorney. Voir dire began two and a half weeks later.

{¶ 25} Reynolds contends he was denied the effective assistance of counsel because it is unreasonable to expect counsel to prepare for a capital trial in two

weeks. The record reflects that the trial court questioned O'Brien extensively concerning his ability to prepare for trial in the short period of time available to him. O'Brien stated that he could be adequately prepared. The court also asked Reynolds and Pappas whether they were comfortable with the timetable. Reynolds and Pappas expressed their agreement with the new arrangement.

{¶ 26} O'Brien prepared for the trial by reviewing materials that had been prepared by Pappas and Keith. Pappas remained on the case and provided continuity of representation to Reynolds. The trial court indicated, by journal entry, that new counsel would be granted time to file additional motions and to request a delay if necessary.

{¶ 27} At oral argument, Reynolds's counsel invited this court to adopt a *per se* rule that appointed counsel cannot be required to begin a capital trial within such a short period of time. We decline the invitation. Instead, we examine counsel's performance under the standard set forth in *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. In order to prevail on a claim of ineffective assistance of counsel, Reynolds must show that counsel's performance fell below an objective standard of reasonableness and that prejudice arose from counsel's performance. See *Strickland* at 687, 104 S.Ct. at 2064, 80 L.Ed.2d at 693; *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraphs two and three of the syllabus.

{¶ 28} Reynolds has not demonstrated that he was prejudiced by lead counsel's belated appointment. We also find no evidence in the record that O'Brien was hampered by his late appointment. O'Brien, separately or together with Pappas, filed motions in addition to those filed by Keith and Pappas, questioned jurors during voir dire, cross-examined the state's witnesses in the trial phase, conducted direct examination in the penalty phase, and gave closing arguments in both phases. We conclude that Reynolds was not prejudiced by the appointment of O'Brien two weeks prior to trial, and accordingly reject the first proposition of law.

*Pretrial Suppression Issues*

{¶ 29} In his second proposition of law, Reynolds argues that the evidence obtained from his bedroom should have been suppressed because his father did not have authority to consent to a search. Lawrence Reynolds, Sr. gave permission to police officers to enter his home. Once inside, the officers established that Reynolds, Sr. owned the home and that Reynolds had not paid rent in the past four months. They also determined that Reynolds and Reynolds, Sr. had no agreement about whether Reynolds's bedroom was off limits and that Reynolds did not have any locked compartments in his bedroom. Detective Michael Gay obtained verbal and written consent to search the house and Reynolds's bedroom from Reynolds, Sr. Reynolds, Sr. also provided a taped statement of consent after the search had been completed.

{¶ 30} While the Fourth Amendment prohibits warrantless searches, there are exceptions to this general rule. For instance, searches may be conducted when the owner of the property or a person with common authority over the property voluntarily consents to a search. *United States v. Matlock* (1974), 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242; *State v. Sneed* (1992), 63 Ohio St.3d 3, 7, 584 N.E.2d 1160, 1165. The state has the burden of establishing that Reynolds's father had the required common authority to consent to a search. *Illinois v. Rodriguez* (1990), 497 U.S. 177, 181, 110 S.Ct. 2793, 2797, 111 L.Ed.2d 148, 156.

{¶ 31} Parents may consent to a search of premises owned by them. See *State v. McCarthy* (1971), 26 Ohio St.2d 87, 92, 55 O.O.2d 161, 164, 269 N.E.2d 424, 427; *State v. Carder* (1966), 9 Ohio St.2d 1, 10, 38 O.O.2d 1, 6, 222 N.E.2d 620, 627. Reynolds, Sr. owned the house that was searched and there was no agreement between him and Reynolds concerning the privacy of Reynolds's bedroom. See *United States v. Evans* (C.A.7, 1994), 27 F.3d 1219, 1230; *United States v. Roark* (C.A.6, 1994), 36 F.3d 14, 17; *State v. Chapman* (1994), 97 Ohio App.3d 687, 691-692, 647 N.E.2d 504, 507; *State v. Gavin* (1977), 51 Ohio App.2d

49, 53, 5 O.O.3d 168, 170, 365 N.E.2d 1263, 1265. Reynolds had not been paying rent, which would have given him a claim that he had a proprietary interest in his bedroom. For these reasons, we conclude that the investigating officers received constitutionally adequate consent from Reynolds, Sr. We reject Reynolds's second proposition of law.

{¶ 32} In his third proposition of law, Reynolds challenges the trial court's denial of his motion to suppress statements. One particular statement that Reynolds moved to suppress was ruled admissible though never introduced at trial. Pursuant to Crim.R. 52(A), a court should disregard any error "which does not affect substantial rights." If any error existed in denying the motion to suppress the statement, it was harmless beyond a reasonable doubt. Reynolds's third proposition of law is rejected.

*Voir Dire Issues*

{¶ 33} Reynolds asserts in his fourth proposition of law that the trial court erred when it overruled his motion to prohibit the use of peremptory challenges to exclude jurors who expressed concerns about capital punishment. In *State v. Esparza* (1988), 39 Ohio St.3d 8, 13, 529 N.E.2d 192, 198, we held that the use of peremptory challenges against prospective jurors opposed to the death penalty was not improper. Prosecutors can exercise peremptory challenges for any reason, without inquiry, and without a court's control, except that jurors cannot be excluded on the basis of race or gender. *State v. Seiber*, 56 Ohio St.3d 4, 13, 564 N.E.2d 408, 419; *J.E.B. v. Alabama ex rel. T.B.* (1994), 511 U.S. 127, 114 S.Ct. 1419, 128 L.E.2d 89. Thus, it was not error for the trial court to allow the challenged peremptory challenges. The fourth proposition of law is rejected.

{¶ 34} In his fifth proposition of law, Reynolds argues that the jury panel was tainted because the trial court erred by delaying an excusal for cause. Prospective juror John Vanhyning was a part-time police officer for the city of Rittman and had been involved in law enforcement for forty years. Defense counsel

moved to exclude Vanhyning for cause based on his answers during individual voir dire. The trial court "noted" the objection, but allowed the prospective juror to proceed into general voir dire.

{¶ 35} During general voir dire, Vanhyning disclosed that he knew many of the state's witnesses, such as the coroner, Bureau of Criminal Investigation investigators, and police officers. Vanhyning knew the county prosecutor personally and had previously worked with Michael Carroll, one of the assistant prosecutors in this case. Vanhyning also indicated that he had always found "the gentleman that I knew," presumably Detective Michael Gay (one of the state's witnesses), to be truthful. After these comments, the court called the prospective juror and counsel to sidebar where the court and counsel further questioned Vanhyning. The trial court then, *sua sponte*, excused Vanhyning for cause.

{¶ 36} As Vanhyning was excused for cause and did not sit on Reynolds's jury, the only issue is whether Vanhyning's comments during general voir dire tainted the remaining jurors. Vanhyning's comments about Gay's truthfulness were potentially prejudicial. However, these remarks were tempered by the prosecutor's response that the other jurors did not know the detective and would have to evaluate his testimony based on what he said in court. Vanhyning also commented that his experience indicated that prosecutor Carroll was efficient. This comment was also tempered by the prosecutor, who replied that what happened in the past was in the past and this case would have to be decided based on evidence presented in this courtroom. The trial court instructed the jury on what evidence could properly be considered, and further instructed that they would have to decide the case for themselves. No evidence in the record suggests that the jury that was seated in this case was not a fair and impartial jury as mandated by the Constitution. We reject the fifth proposition of law.

*Trial Phase Errors*

{¶ 37} In his sixth proposition of law, Reynolds argues that the trial court erred in admitting gruesome photographs. Seven photographs taken at the crime scene were admitted into evidence and fourteen slides were used by the coroner during his testimony. Reynolds argues that the photographs duplicated the coroner's slides and that the readmission of two of the seven photographs (State's Exhibits 23 and 24) in the penalty phase was error.

{¶ 38} Each photograph admitted had significant probative value for the prosecution. The admitted photographs illustrated the testimony of the state's witnesses concerning evidence found at the murder scene and the condition of Foster's body. We conclude that the trial court did not abuse its discretion in admitting the photographs because they were relevant and of probative value. See *State v. Maurer* (1984), 15 Ohio St.3d 239, 15 OBR 379, 473 N.E.2d 768, paragraph seven of the syllabus, and *State v. Morales* (1987), 32 Ohio St.3d 252, 258, 513 N.E.2d 267, 273-274.

{¶ 39} The coroner's slides served a wholly different purpose than the crime scene photographs. The slides illustrated the coroner's testimony concerning the injuries sustained by Foster and the cause of her death. The photographs showed how the body was found at the crime scene as well as other items found at the scene, such as the phone ripped out of the wall and a jug containing one inch of water that had possibly been used to dilute blood stains. The photographs thus gave the jury an "appreciation of the nature and circumstances of the crimes." *State v. Evans* (1992), 63 Ohio St.3d 231, 251, 586 N.E.2d 1042, 1058; *State v. Allen* (1995), 73 Ohio St.3d 626, 636, 653 N.E.2d 675, 686. We conclude that the coroner's slides and the crime scene photographs were not cumulative.

{¶ 40} The two crime scene photographs readmitted in the penalty phase (State's Exhibits 23 and 24) were used to illustrate the aggravating circumstances of the case. We conclude that the photographs were not cumulative because they served a different purpose during the penalty phase. See *State v. DePew* (1988), 38

Ohio St.3d 275, 282-283, 528 N.E.2d 542, 551-552. We reject Reynolds's sixth proposition of law.

{¶ 41} In his seventh proposition of law, Reynolds argues that the trial court gave an impermissible "acquittal first" instruction on the aggravated murder and aggravated burglary charges. No objection was raised to either instruction at trial and no error was assigned in the court of appeals. Therefore this issue is waived and must fail absent plain error. *State v. Campbell* (1994), 69 Ohio St.3d 38, 40-41, 630 N.E.2d 339, 344-345. See Crim.R. 52(B).

{¶ 42} "An alleged error 'does not constitute a plain error or defect under Crim.R. 52(B) unless, but for the error, the outcome of the trial clearly would have been otherwise.' " *Campbell* at 41, 630 N.E.2d at 345, citing *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph two of the syllabus. The trial court did not err because the instructions given were consistent with those approved by this court in *State v. Thomas* (1988), 40 Ohio St.3d 213, 218-221, 533 N.E.2d 286, 291-293, and paragraph three of the syllabus. We reject the seventh proposition of law.

{¶ 43} In his eighth proposition of law, Reynolds contends that statements made by Foster to three persons prior to her death were hearsay and improperly admitted. Defense counsel did not object to these statements at trial and the issue was not assigned as error in the court of appeals. Therefore, this issue was waived and must fail absent plain error. *Campbell*, 69 Ohio St.3d at 40-41, 630 N.E.2d at 344-345.

{¶ 44} Foster's statements to her son and sister-in-law that she was "fearful" or "concerned" were admissible under Evid.R. 803(3), which permits admission of a "statement of the declarant's then existing state of mind, emotion, [or] sensation * * *." See *State v. Apanovitch* (1987), 33 Ohio St.3d 19, 21, 514 N.E.2d 394, 397; *State v. Simko* (1994), 71 Ohio St.3d 483, 491, 644 N.E.2d 345,

352-353; and *State v. Frazier* (1995), 73 Ohio St.3d 323, 338, 652 N.E.2d 1000, 1013.

{¶ 45} Foster's statements concerning Reynolds's actions in the days before the murder and her statements explaining the reasons why she was scared were clearly hearsay and not admissible under any of the recognized exceptions to the rule. *Apanovitch* at 21, 514 N.E.2d at 397-398. Since the defense failed to object, we must determine whether the admission of these statements affected the outcome of the trial. We conclude that it did not, primarily because Reynolds did not deny his involvement in the murder and because he told a number of witnesses on the night of the murder what he had done. There was no plain error with respect to these hearsay statements.

{¶ 46} Denise Feist, who worked for Foster's doctor, testified that Foster stated that her blood pressure was probably high because Foster was nervous about her neighbor (Reynolds). Feist testified that Foster had stated that the neighbor had knocked on her door after dark and that she was afraid because she did not know what he wanted. Feist identified State's Exhibit 69 as a page from Foster's medical records in which the doctor had written down her blood pressure and noted she was "[a]nxious about young neighbor that keeps coming over." The statements concerning the fact that Foster was nervous or fearful are admissible under Evid.R. 803(3). See discussion *supra*. The statements concerning her high blood pressure are also admissible under Evid.R. 803(4), which creates an exception to the hearsay evidence rule for statements made for purposes of medical diagnosis or treatment. *State v. Boston* (1989), 46 Ohio St.3d 108, 120-121, 545 N.E.2d 1220, 1233. While the remaining statements should have been excluded as hearsay, no objection was raised and plain error is not evident. We reject Reynolds's eighth proposition of law.

*Sentencing Phase Issues*

**{¶ 47}** The state opened the penalty phase by calling Foster's son, Michael Foster, as a "victim-impact witness." Foster testified that he was an only child and that his father had passed away many years earlier, that his mother was from a large family and her house had been the gathering place for the family, and that his mother had touched "everyone's life" and been a special part of their lives. When the prosecutor asked him to describe the effect his mother's death had had on him, Michael became distraught and was unable to answer. He indicated that one of his daughters was getting married in July and that his mother had been looking forward to the wedding. Michael's other daughter had once lived with Foster for a period of time. He testified that both granddaughters missed their grandmother very much.

**{¶ 48}** The prosecutor incorporated the victim-impact testimony into his closing argument:

"He told you as best he can the effect this crime has had on himself and his family, and it is an extended family of Mrs. Foster. *Considerations of the effect of a crime upon the victim, the victim's family, are things you can think about in making a decision here. And I urge you to do that.*" (Emphasis added.)

**{¶ 49}** Reynolds presents four propositions of law concerning this victim-impact evidence which we will address in turn.

**{¶ 50}** In his tenth proposition of law, Reynolds argues that the admission of victim-impact testimony was error. Counsel did not object. Accordingly, the allowance of the victim-impact testimony must be examined under the plain-error standard. *Campbell*, 69 Ohio St.3d 38, 630 N.E.2d at 339. Given the four aggravating circumstances and the fact that the statement was not overly emotional or directed to the penalty to be imposed, it cannot be said that the sentence would clearly have been otherwise but for the victim-impact evidence. See *State v. Taylor* (1997), 78 Ohio St.3d 15, 27, 676 N.E.2d 82, 94; *State v. Allard* (1996), 75 Ohio St.3d 482, 499-500, 663 N.E.2d 1277, 1292; *State v. Wilson*, 74 Ohio St.3d 381, 399, 659 N.E.2d 292, 309-310; *State v. Fautenberry* (1995), 72 Ohio St.3d 435,

438-439, 650 N.E.2d 878, 882; *State v. Lorraine* (1993), 66 Ohio St.3d 414, 421, 613 N.E.2d 212, 219; *State v. Slagle* (1992), 65 Ohio St.3d 597, 611-612, 605 N.E.2d 916, 929-930; and *State v. Evans*, 63 Ohio St.3d at 238, 586 N.E.2d at 1050. See, also, *Payne v. Tennessee* (1991), 501 U.S. 808, 827, 111 S.Ct. 2597, 2609, 115 L.Ed.2d 720, 736. We find no plain error and therefore reject the tenth proposition of law.

{¶ 51} In his eleventh proposition of law, Reynolds contends that the prosecutor's statement cited above amounted to misconduct. We agree that the prosecutor's remarks imploring the jury to consider the effect of the crime on Foster and her family were likely improper. It is impossible to determine the weight given the victim-impact evidence by the jury. We conclude that the outcome of the penalty phase would not clearly have been otherwise but for the imploring of the prosecutor. See *Long*, 53 Ohio St.2d at 96-97, 7 O.O.3d at 181, 372 N.E.2d at 808. We reject the eleventh proposition of law.

{¶ 52} In his fifteenth proposition of law, Reynolds contends that the trial court's consideration of the victim-impact testimony was error. There is no indication that the trial court considered or weighed this evidence in making its determination. We reject the fifteenth proposition of law.

{¶ 53} In his first proposition of law, Reynolds contends that counsel's failure to object to the victim-impact evidence or the prosecutor's use of it constituted ineffective assistance of counsel. Even though counsel should have objected, Reynolds is unable to show prejudice. There is no reasonable probability that the outcome would have been different. Accordingly, counsel's failure to object to the victim-impact testimony does not rise to the level of ineffective assistance of counsel. We reject that portion of the first proposition of law.

{¶ 54} After Michael Foster testified, the state called Reynolds's brother, Jason, as a witness. Defense counsel objected. The prosecutor stated that Jason would testify about Reynolds's state of mind when he and Reynolds went to

Foster's residence, only hours after the murder was committed. The trial court did not allow the state to call Jason at that time. Later in the penalty phase, the court permitted the state to call Jason as a rebuttal witness. In his ninth proposition of law, Reynolds challenges the admission of his brother's testimony.

{¶ 55} Immediately after the state's direct examination of Jason, defense counsel moved to strike Jason's testimony, arguing that it was improper rebuttal evidence. The prosecutor claimed that Jason had been called as a witness to rebut a statement made by defense counsel in his opening statement of the *trial* phase that Reynolds had not attempted to conceal himself. The trial court denied the motion to strike.

{¶ 56} Reynolds now argues that the admission of this testimony was error because it was improper and prejudicial rebuttal evidence. In construing R.C. 2929.03(D), we have held that the state may introduce evidence to rebut the existence of any statutorily defined or other mitigating factors first asserted by the defendant. *DePew,* 38 Ohio St.3d at 286-287, 528 N.E.2d at 555; *State v. Gumm* (1995), 73 Ohio St.3d 413, 653 N.E.2d 253, syllabus. Jason's testimony rebutted defense penalty phase evidence. In his unsworn statement, Reynolds claimed that he had been so intoxicated on the night of the murder that he hadn't been able to control what he was doing. Jason testified that when he saw Reynolds at 6:00 p.m. on the night of the murder, he could tell that Reynolds had been drinking, but did not think Reynolds was drunk. The defense attempted to portray the murder as impulsive, brought on by Reynolds's ingestion of alcohol. Jason's testimony rebutted this evidence and suggested that the crime was part of a calculated plan. Accordingly, we conclude that the testimony offered by Jason was not improper or prejudicial.

{¶ 57} Reynolds also argues that the admission of Jason's testimony allowed the jury to infer that Jason was in favor of imposing the death sentence on his brother. This argument is speculative. Jason expressed no opinion on the death

penalty, his feelings about what his brother had done, or what punishment his brother should receive. Additionally, defense counsel had the opportunity, through cross-examination, to clarify for the jury that Jason did not wish his brother to be executed. We conclude that Jason's testimony did not allow the jury to draw an improper inference. We reject the ninth proposition of law.

{¶ 58} In his eleventh proposition of law, Reynolds contends that two of the prosecutor's comments during the penalty phase were personal opinions and therefore improper. In his opening statement, the prosecutor stated, "And *I tell you* that the evidence in this case will prove beyond a reasonable doubt that the aggravating circumstances do outweigh the mitigating factors." (Emphasis added.) The prosecutor used the same language in his penalty phase closing argument.

{¶ 59} The general rule is that "where personal opinions of guilt are predicated upon the evidence, though frowned upon, they are not deemed to be prejudicially erroneous." *State v. Stephens* (1970), 24 Ohio St.2d 76, 83, 53 O.O.2d 182, 186, 263 N.E.2d 773, 777. It is difficult for prosecutors to argue vigorously for the death penalty without making statements that can be arguably construed as statements of personal opinion. *State v. Tyler* (1990), 50 Ohio St.3d 24, 41, 553 N.E.2d 576, 595. We conclude that the statements made by the prosecutor were permissible argument. We reject Reynolds's eleventh proposition of law.

{¶ 60} Reynolds was charged, convicted, and sentenced for four separate felonies: aggravated burglary, aggravated robbery, kidnapping, and attempted rape. In his seventeenth proposition of law, Reynolds argues that the four felony counts should have been "merged" for sentencing. Reynolds argues, as did defense counsel during the sentencing hearing, that since "all of the conduct of which Defendant was convicted occurred within a relatively short period of time, during the same evening, in the same flow and course of conduct," the offenses should merge.

{¶ 61} R.C. 2941.25(A) provides that where the conduct of a defendant can be construed as constituting two or more allied offenses of similar import, the indictment may contain counts for all such offenses, but the defendant may be convicted of only one. See *Newark v. Vazirani* (1990), 48 Ohio St.3d 81, 549 N.E.2d 520, syllabus. Offenses are of similar import when their elements "correspond to such a degree that commission of one offense constitutes commission of the other offense." *State v. Bickerstaff* (1984), 10 Ohio St.3d 62, 66, 10 OBR 352, 356, 461 N.E.2d 892, 896.

{¶ 62} Aggravated robbery and aggravated murder are not allied offenses of similar import. *Bickerstaff*, 10 Ohio St.3d at 66, 10 OBR at 356, 461 N.E.2d at 895-896. Aggravated burglary and aggravated murder are not allied offenses of similar import. *State v. Henderson* (1988), 39 Ohio St.3d 24, 28, 528 N.E.2d 1237, 1242; *Frazier*, 73 Ohio St.3d at 342-343, 652 N.E.2d at 1016.

{¶ 63} Reynolds committed aggravated burglary when he used deception to obtain entry into Foster's home and used force to complete that entry in order to take her property. Reynolds committed aggravated robbery when he subjected Foster to further injury in order to take her property. We conclude that the offenses were committed separately and with a separate animus. See *State v. Frazier* (1979), 58 Ohio St.2d 253, 256, 12 O.O.3d 263, 264-265, 389 N.E.2d 1118, 1120. In this case, aggravated burglary and aggravated robbery were not allied offenses of similar import.

{¶ 64} The facts indicate that the defendant had an animus to rape Foster. This animus was separate from the animus to commit burglary, robbery, kidnapping, and murder. *State v. Williams* (1996), 74 Ohio St.3d 569, 580, 660 N.E.2d 724, 734. Accordingly, the attempted rape charge should not merge into any of the other felonies.

{¶ 65} Restraint, an essential element of kidnapping, is often necessary to facilitate other crimes, such as rape, robbery, and murder. *State v. Logan* (1979),

60 Ohio St.2d 126, 14 O.O.3d 373, 397 N.E.2d 1345.  We have held that kidnapping and another offense are committed with a separate animus when the "restraint of the victim subjects the victim to a substantial increase in risk of harm separate and apart from that involved in the underlying crime * * *." *Logan* at paragraph (b) of the syllabus.

{¶ 66} Reynolds was in the process of robbing Foster when he noticed she was attempting to use the phone and struck her.  At that time, he tied Foster's hands behind her back, restraining her.  Only after Reynolds had restrained Foster for a period of time did he kill her.  At some point, he attempted to rape her.  It is apparent to us that the kidnapping in this case constituted a separate offense from the murder, *State v. Jells* (1990), 53 Ohio St.3d 22, 33, 559 N.E.2d 464, 475, from the attempted rape, *State v. Powell* (1990), 49 Ohio St.3d 255, 262, 552 N.E.2d 191, 199, and from the robbery, *State v. Jenkins* (1984), 15 Ohio St.3d 164, 197-198, 15 OBR 311, 339-340, 473 N.E.2d 264, 295; *State v. Perkins* (1994), 93 Ohio App.3d 672, 684, 639 N.E.2d 833, 841.

{¶ 67} Unlike robbery or rape, burglary does not definitionally require the victim's restraint, *State v. Waddy* (1992), 63 Ohio St.3d 424, 448, 588 N.E.2d 819, 837, because the infliction of physical harm, an essential element of aggravated burglary under R.C. 2911.11(A)(1), does not require a victim to be restrained.  Even if it did, Reynolds imposed further restraint on the victim by tying her up.  Thus, aggravated burglary under either R.C. 2911.11(A)(1) or (3) and kidnapping are not allied offenses of similar import.  We conclude that none of the felonies in this case were allied offenses of similar import.  The seventeenth proposition of law is rejected.

{¶ 68} The four separate felonies of which Reynolds was convicted were used to allege four separate aggravating circumstances under R.C. 2929.04(A)(7).  Defense counsel moved to merge the specifications prior to the start of the penalty phase.  The trial court denied the motion.  In his sixteenth proposition of law,

Reynolds argues that the trial court erred. Defendant relies on *State v. Jenkins*, paragraph five of the syllabus, where this court stated, "where two or more aggravating circumstances arise from the same act or indivisible course of conduct and are thus duplicative, the duplicative aggravating circumstances will be merged for purposes of sentencing." Only aggravating circumstances that are allied offenses of similar import are "duplicative" within the meaning of *Jenkins*. See *Waddy*, 63 Ohio St.3d at 448, 588 N.E.2d at 837. We have already determined that none of the separate felonies constituted allied offenses of similar import. We conclude that the trial court did not abuse its discretion in refusing to merge the capital specifications. Reynolds's sixteenth proposition of law is rejected.

*Sentencing Hearing*

{¶ 69} After the jury recommended the death penalty, the trial court scheduled the sentencing hearing for 8:45 a.m. on June 9, 1994. At that hearing, the trial court addressed defendant's convictions for aggravated robbery, aggravated burglary, kidnapping, and attempted rape. After permitting counsel for both parties to speak about those convictions, the judge asked Reynolds if he had anything to say before the court pronounced sentence for those crimes. Reynolds indicated he had nothing to say.

{¶ 70} After sentencing Reynolds for aggravated robbery, aggravated burglary, kidnapping, and attempted rape, the judge addressed the aggravated murder count, stating, "This Court's written decision has been prepared. It is now being filed, and copies will soon be available to counsel." The record indicates that the opinion was filed at 9:05 a.m.

{¶ 71} The trial court then asked counsel for both parties if they wished to address the court concerning the aggravated murder count. The state urged the trial court to impose the death penalty; defense counsel argued against imposition of the death penalty. The trial court did not ask Reynolds if he wished to address the court concerning the aggravated murder count. Defendant's lead counsel stated during

his presentation that defendant had "addressed the Court previously by way of a letter." The trial court proceeded to sentence defendant to death. The hearing was concluded at 9:21 a.m.

**{¶ 72}** In his eighteenth proposition of law, Reynolds argues that the sentencing hearing was "a mockery" because the trial court filed its sentencing opinion before the conclusion of the sentencing hearing. He argues that the trial court also erred in failing to ask Reynolds if he desired to make a statement before sentence was imposed on the aggravated murder count.

**{¶ 73}** The state concedes that the trial court acted prematurely in filing its sentencing order prior to the completion of the sentencing hearing. We agree that the trial court should have waited until the sentencing hearing was completed to file its sentencing order. However, it is apparent to us that Reynolds was not prejudiced by the court's premature filing.

**{¶ 74}** The trial court sat through the trial and penalty phases of the case and had listened to the evidence presented as to the aggravating circumstances and mitigating factors. The court had from May 31st until June 9th to consider the evidence presented by both sides. Counsel's arguments for Reynolds during the sentencing hearing were substantially the same as the arguments advanced during the penalty phase. Had new evidence or information been presented during the sentencing hearing, the trial court could have modified its sentencing order. We conclude that the premature filing was not prejudicial error.

**{¶ 75}** Crim.R. 32(A) provides that "[b]efore imposing sentence the court shall afford counsel an opportunity to speak on behalf of the defendant and also shall address the defendant personally and ask if he or she wishes to make a statement in his or her own behalf or present any information in mitigation of punishment." Thus, the failure of the court to ask Reynolds if he wanted to make a statement before imposition of sentence on the aggravated murder court was error.

{¶ 76} Defense counsel spoke on his client's behalf and stated that "Reynolds has addressed the court previously by way of a letter." The purpose of allocution is to permit the defendant to speak on his own behalf or present any information in mitigation of punishment. Reynolds had this opportunity in the penalty phase of the case when he presented evidence and made an unsworn statement. A court's error in failing to ask a defendant if he wants to make a statement prior to sentencing is not prejudicial where, as here, the defendant makes an unsworn statement in the penalty phase, sends a letter to the trial court, and where defense counsel makes a statement on behalf of the defendant. The eighteenth proposition of law is rejected.

{¶ 77} The penalty phase in a capital case is not a substitute for a defendant's right of allocution. Failure to provide a defendant the right of allocution could constitute reversible error in a future case.

*Trial Court Opinion*

{¶ 78} In his twelfth proposition of law, Reynolds contends that the trial court erred in its written sentencing opinion by (1) failing to state why the aggravating circumstances outweighed the mitigating factors, (2) considering nonstatutory factors, and (3) failing to assign weight to the mitigating factor of alcoholism.

{¶ 79} Whether the trial court properly stated why the aggravating circumstances outweighed the mitigating factors is arguable. This court's independent sentence review of the aggravating circumstances and mitigating factors will correct this deficiency, if indeed it is a deficiency. *State v. Lott* (1990), 51 Ohio St.3d 160, 170-173, 553 N.E.2d 293, 304-307. We conclude that the trial court's failure to unambiguously explain why the aggravating circumstances outweighed the mitigating factors is not prejudicial error.

{¶ 80} While the trial court discussed the facts surrounding the crime (a nonstatutory factor) in its opinion, it did not weigh those facts as aggravating

circumstances. Instead the court reviewed the nature and circumstances of the crime, as it was required to do pursuant to R.C. 2929.03. *State v. Stumpf* (1987), 32 Ohio St.3d 95, 512 N.E.2d 598, paragraph one of the syllabus; *Lott*, 51 Ohio St.3d at 171, 553 N.E.2d at 304-305. We conclude that the trial court did not consider nonstatutory factors.

{¶ 81} Reynolds argues that the trial court did not give "significant" weight to his alcoholism. The statute does not require that significant weight be accorded. The weight, if any, given to a mitigating factor is a matter for the discretion of the individual decision-maker. *State v. Fox* (1994), 69 Ohio St.3d 183, 193, 631 N.E.2d 124, 132; *State v. Mills* (1992), 62 Ohio St.3d 357, 376, 582 N.E.2d 972, 988. We conclude that the trial court properly weighed the mitigating factor of alcoholism.

{¶ 82} We note, *sua sponte*, that the trial court did not correctly weigh the aggravating circumstances and mitigating factors. The court weighed each aggravating circumstance separately against the mitigating factors instead of weighing all the aggravating circumstances against all the mitigating factors. See *State v. Cooey* (1989), 46 Ohio St.3d 20, 38-39, 544 N.E.2d 895, 916-917. The trial court stated in its opinion that "the state of Ohio has proved beyond a reasonable doubt that each aggravating circumstance for which he was found guilty outweighed all the mitigating factors." Although this issue was not raised by Reynolds, our independent review will cure the error. *Fox*, 69 Ohio St.3d at 191, 631 N.E.2d at 131.

{¶ 83} We note, *sua sponte*, that the court's journal entry imposes the sentence of death five times — one for the aggravated murder charge and one for each aggravating circumstance. Although this issue was not raised by the parties, our independent review will cure the error.

{¶ 84} We reject the twelfth proposition of law.

*Constitutional Challenges*

**{¶ 85}** In his fourteenth proposition of law, Reynolds argues that the death penalty review procedures are flawed because this court reviews only death penalty cases when conducting its statutorily mandated proportionality review. We summarily reject this argument on the authority of *State v. Steffen* (1987), 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383, paragraph one of the syllabus.

**{¶ 86}** Reynolds argues that Ohio's capital sentencing scheme violates the Cruel and Unusual Punishment Clause of the Eighth Amendment to the United States Constitution. We summarily reject this argument on the authority of *State v. Poindexter* (1988), 36 Ohio St.3d 1, 520 N.E.2d 568, syllabus; *Jenkins* at paragraph one of the syllabus; *State v. Sowell* (1988), 39 Ohio St.3d 322, 336, 530 N.E.2d 1294, 1309; *Steffen*, 31 Ohio St.3d at 125, 31 OBR at 285-286, 509 N.E.2d at 396; *State v. Grant* (1993), 67 Ohio St.3d 465, 483, 620 N.E.2d 50, 69; *Maurer* at paragraph one of the syllabus; and *State v. Buell* (1986), 22 Ohio St.3d 124, 22 OBR 203, 489 N.E.2d 795.

*Independent Sentence Review*

**{¶ 87}** This court is required by R.C. 2929.05 to independently review this case and conduct an appropriateness and proportionality evaluation as to the death sentence. We conclude that the evidence in the record supports a finding that Lawrence Reynolds, Jr. committed the aggravated murder of Loretta Foster while committing, attempting to commit, or fleeing immediately after committing or attempting to commit kidnapping, rape, aggravated robbery, and aggravated burglary. Moreover, the evidence establishes that Reynolds was the principal offender in the commission of the aggravated murder.

**{¶ 88}** The nature and circumstances of the crime offer nothing in mitigation for Reynolds. His history, character, and background suggest some mitigating factors. Reynolds was raised in a middle class home by both parents. He began drinking alcohol in his early teens. After graduating from high school, he served in the Army for six years before being honorably discharged. Upon

discharge, he moved in with his parents. He eventually found employment and moved into his own apartment. Throughout this time, the use of alcohol continually plagued his life.

{¶ 89} As his alcohol usage increased, it affected his employment, leading to his termination from his job. In January 1992, he was arrested for driving under the influence and failing to comply with a police officer's signal or order. He moved back in with his parents and completed alcohol treatment as part of his probation, but soon began drinking again. He appears to have been employed, or earning some money, until about four months prior to the crimes. He then began to sell his personal belongings to support his drinking habit. By the time of the murder, he had become desperate because he had nothing more to sell.

{¶ 90} Dr. Joseph Bendo, a psychologist, diagnosed Reynolds as having an adjustment disorder, which caused him to react more strongly than the stressors or the environment in his life might warrant. Dr. Bendo concluded that Reynolds had an antisocial personality type with addictive-proneness to alcohol and drugs. His drinking was a product of his inability to relate effectively with people. While this proclivity does not meet the mitigating factor standard of R.C. 2929.04(B)(3), we will consider it under R.C. 2929.04(B)(7).

{¶ 91} In an unsworn statement, Reynolds expressed his remorse to the victim's family and to his own family and asked the jury to spare his life.

{¶ 92} We weigh the aggravating circumstances against the following mitigating factors: lack of a substantial criminal record (R.C. 2929.04[B][5]), honorable military service to his country, alcoholism, emotional problems, and remorse for the crime. The lack of a substantial criminal record is entitled to relatively significant weight. The remaining factors, such as his military service, are entitled to some weight. Another factor to consider is the prosecutor's "overzealous" application of the aggravating circumstances "to the same act or

24

indivisible course of conduct," which was criticized in *Jenkins*, 15 Ohio St.3d at 197, 15 OBR at 339, 473 N.E.2d at 294.

{¶ 93} We conclude that the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt. While this court has not had any prior cases with the same four aggravating circumstances, we will review comparable cases for proportionality comparison.

{¶ 94} In *State v. Durr* (1991), 58 Ohio St.3d 86, 568 N.E.2d 674, Durr was found guilty and sentenced to death for aggravated murder during the course of a kidnapping, aggravated robbery, and rape. The mitigating evidence was minimal, Durr came from a broken home, and his common-law wife was pregnant. Durr exhibited no remorse for his crimes. The court found the death penalty appropriate in *Durr*.

{¶ 95} In *State v. Rojas* (1992), 64 Ohio St.3d 131, 592 N.E.2d 1376, Rojas was found guilty and sentenced to death for aggravated murder during the course of a rape, aggravated burglary, and aggravated robbery. Rojas suffered from a mental disease which was not strong enough to be considered under R.C. 2929.04(B)(3). Rojas was the same age when the crime was committed as Reynolds. Rojas had a much lower intelligence level than Reynolds. Rojas exhibited remorse for his crimes. The court found the death penalty appropriate in *Rojas*.

{¶ 96} *State v. Holloway* (1988), 38 Ohio St.3d 239, 527 N.E.2d 831, and *State v. Murphy* (1992), 65 Ohio St.3d 554, 605 N.E.2d 884, are also comparable to the case before us. Holloway and Murphy broke into the homes of elderly female neighbors to rob them. The mitigating evidence presented in *Holloway* (mild mental retardation, personality disorder, physical deformity, and abuse) and *Murphy* (mental impairment, impoverished background, alcoholic father, victimization by verbal, physical, and sexual abuse) was more compelling than that presented herein. This court found the death penalty appropriate in those cases.

We conclude that the death sentence in the case before us is not disproportionate to the death sentences imposed in similar death penalty cases.

{¶ 97} Finding the death penalty appropriate and proportionate, we affirm the sentence of death. The judgment of the court of appeals is hereby affirmed.

*Judgment affirmed.*

MOYER, C.J., DOUGLAS, F.E. SWEENEY, COOK and LUNDBERG STRATTON, JJ., concur.

RESNICK, J., concurs in judgment only.

_____