OPINION
Defendant-appellant, Robert B. Aeh, appeals from a judgment of the Franklin County Court of Common Pleas overruling his motion for post-conviction relief following an evidentiary hearing. Defendant assigns a single error:
 THE TRIAL COURT ERRED WHEN IT DENIED THE DEFENDANT'S PETITION TO VOID HIS CONVICTION AND GRANT HIM A NEW TRIAL ON THE GROUNDS THAT HE HAD RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL AT HIS TRIAL AND ON THE FURTHER GROUNDS THAT THE DEFENDANT'S RIGHTS TO A FAIR TRIAL AND DUE PROCESS OF LAW WERE VIOLATED BY THE STATE'S USE OF ERRORNEOUS, [sic] FALSE, AND MISLEADING TESTIMONY AT TRIAL.
Because the record fails to demonstrate that the outcome of the trial probably would have been different in the absence of trial counsel's ineffectiveness, we affirm.
Defendant was indicted by the Franklin County Grand Jury on a single count of aggravated murder in violation of R.C.2903.01, with a firearm specification. Defendant was charged with the death of his wife, Janet L. Aeh, who died from a single gunshot wound to the left side of her head on June 8, 1994. Following a jury trial, defendant was convicted as charged, and the trial court imposed a sentence of twenty years to life, with three additional years of actual incarceration for the firearm specification. On appeal, this court affirmed the judgment of the trial court. State v. Aeh (June 27, 1996), Franklin App. No. 95APA11-1449, unreported.
On July 31, 1996, defendant filed a petition to vacate his conviction, contending his trial counsel did not render effective assistance, in violation of the Sixth andFourteenth Amendments to the United States Constitution and Section 10, Article I of the Ohio Constitution. In arguing his petition, defendant noted that the prosecution relied on four primary contentions to counter defendant's defense that his wife committed suicide: (1) the drugs she took rendered her unconscious at the time of her death, (2) her body was arranged after death to make it appear a suicide, (3) the gun which killed the decedent was fired from a distance of more than two feet from her, and (4) no fingerprints were found on the gun.
To support his petition, defendant attempted to demonstrate viable evidence counsel could have presented to undermine some of the state's four contentions. To that end, defendant tendered the affidavit of Alfred E. Staubus, Pharm.D., Ph.D., to undercut the state's contention that the decedent was unconscious at the time of her death. Dr. Staubus' affidavit stated that "[b]ased upon both the literature and my education and training in pharmacology and toxicology, it is my professional opinion, to a reasonable degree of scientific certainty, that it is impossible to state that the decedent was unconscious just prior to her death and, due to the decedent's chronic use of drugs and expected tolerance, it is most likely that the level of drugs in her system would not have rendered her unconscious."
The trial court overruled defendant's petition, concluding defendant had failed to submit sufficient evidentiary materials to warrant a hearing on defendant's petition. On appeal, this court reversed, finding defense counsel's failure to call a witness such as Dr. Staubus could rise to the level of ineffective assistance of counsel prejudicial to defendant. Accordingly, the court concluded the trial court should have conducted an evidentiary hearing to determine more fully the nature of Dr. Staubus' testimony, as well as any strategical reason trial counsel chose not to call an expert witness to contradict the state's testimony regarding the decedent's unconsciousness at the time of death. State v. Aeh (Dec. 11, 1997), Franklin App. No. 97APA05-601, unreported.
On remand, the trial court conducted an evidentiary hearing at which defendant presented the testimony of Charles M. Connor and Dr. Staubus. Following the evidentiary hearing, the trial court rendered a decision finding trial counsel's representation of defendant was not deficient, as counsel's failure to call expert witnesses in response to the state's evidence was a strategy decision entitled to great deference by the court. The trial court also found no prejudice to defendant from trial counsel's failure to present the testimony of Connor and Dr. Staubus at trial, concluding that "if the jury had been presented with the testimony from the October 9, 1998 hearing * * * the result would be the same." As a result, the trial court overruled defendant's petition for post-conviction relief.
On appeal, defendant contends he presented enough evidence to demonstrate the ineffectiveness of trial counsel, and the trial court thus erred in failing to sustain his petition for post-conviction relief and to grant a new trial.
To prevail on his claim of ineffective assistance of trial counsel, defendant must show that "counsel's performance fell below an objective standard of reasonableness and that prejudice arose from counsel's performance." State v. Reynolds
(1988), 80 Ohio St.3d 670, 674, citing Strickland v. Washington
(1984), 466 U.S. 668. A two-prong test is used to examine claims of ineffective assistance of counsel. In order to meetStrickland's first prong, defendant must show counsel's conduct was objectively deficient, producing evidence that counsel acted unreasonably. State v. Sally (1998), 81 Ohio St.3d 673, 674. In order to meet Strickland's second prong, defendant must prove that but for counsel's errors, a reasonable probability exits that the result of the trial would be different. Sally, supra.
At trial, defendant presented no expert witnesses to counter the testimony of the state's witness, James L. Ferguson, the Chief Toxicologist and Director of the Toxicology Laboratory for the Franklin County Coroner's Office. In his testimony, Ferguson opined that the combination of drugs found in the body of the decedent rendered her unconscious immediately up to and at the time of her death. While defense counsel attempted to cross-examine Ferguson on the basis of post-mortem redistribution, Ferguson did not retreat from his opinion that the decedent was unconscious at the time of her death.
At the evidentiary hearing on defendant's petition for post-conviction relief, Dr. Staubus, by contrast, testified that the decedent was a chronic user of the drugs found in her body, rendering her accustomed to and tolerant of the effects of those drugs. As a result, Dr. Staubus opined to a reasonable degree of scientific certainty that she "was most likely conscious and not unconscious at the time" of her death. (Tr. 41.) Dr. Staubus, however, admitted he was "not saying whether she was asleep or awake." (Tr. 41-42.) As he explained, "I cannot rule out sleep as a possibility that she was in at the time of death, but the drugs are not consistent with having her to have to be unconscious. She could be sleeping for other purposes." (Tr. 42.) Dr. Staubus also found deficiencies in the testimony of Ferguson, and related the deficiencies to Ferguson's never having to undergo the training that would ordinarily accompany the post-graduate degree Ferguson lacks.
Without question, a mainstay of the state's case against defendant was its contention that the decedent was unconscious at the time of her death, thereby ruling out the possibility of suicide. To the extent Dr. Staubus' testimony undermined that testimony, trial counsel should have presented his, or similar, testimony at the trial. Moreover, the record does not reflect any reason Dr. Staubus' testimony could not be presented to the jury. Dr. Staubus is associated with The Ohio State University and testifies frequently in the Franklin County Municipal Court. Thus, he not only should have been known to defense counsel, but likely would have been available for trial. Trial counsel's failure to do so suggests ineffectiveness.
The trial court attributed defense counsel's failure to call Dr. Staubus to trial strategy. Specifically, the trial court concluded that because defense counsel apparently lacked experts to address the other three prongs of the state's four primary contentions, defense counsel chose instead to call no expert witnesses and to characterize expert testimony as "paid" opinion. While that, in fact, may have been defense counsel's trial strategy, it is not a valid trial strategy and therefore does not preclude a finding that defense counsel was ineffective in representing defendant.
To the extent Ferguson's testimony was unchallenged, defendant to some extent was prejudiced: an unconscious victim could not commit suicide, as defendant contended his wife did. Further enhancing the prejudice of Ferguson's testimony during trial, defense counsel elicited testimony on cross-examination from one of the investigating officers who interviewed defendant. The officer testified that, as a ruse, he suggested to defendant, based on the toxicology report received from the coroner's office, that defendant's wife had been unconscious at the time of her death. According to the officer, defendant "replied, well, that leaves two scenarios, one, that someone broke in and killed her or, two, that I did. And I know no one broke in, and I hate to think I would have done such a thing, but I must have done it." (Tr. Vol. I, 169.)
Without question, Ferguson's testimony, coupled with defendant's admission, was prejudicial to defendant's case. Had defendant presented Dr. Staubus' testimony, he at least would have put before the jury evidence that the decedent more than likely was conscious at the time of her death and thus capable of suicide.
Dr. Staubus' testimony, however, even if fully accepted, did not require acquittal. While Dr. Staubus testified the decedent more than likely was conscious, he candidly admitted "she certainly could be asleep under normal sleeping conditions, I cannot rule out sleep as a possibility that she was in at the time of death." (Tr. 42.) Moreover, through defense counsel's cross-examination, one of the investigating officers testified at trial to the position in which the decedent was found on his arrival. He noted in particular that the decedent apparently had pulled her long hair out from under her as she lay down. As the officer explained: "Well, it was my speculation that if she had been in a seated position and had shot herself, then falling back she would have been laying on her hair. Had she laid down to shoot herself she, one, again, would be laying on her hair. This seemed to me a sleep pose. Something common that women with long hair do that when they go to sleep instead of having all the hair on their neck, they pull it up and out as they lay down on the pillow. That is the impression I got from seeing that." (Tr. Vol. I, 163.)
As a result, even Staubus' testimony does not preclude the state's contention that the decedent could not have committed suicide. However, Staubus' testimony, unlike Ferguson's, does not foreclose the possibility of suicide. Given the foregoing, whether the outcome of the trial probably would have been different is a close question insofar as defendant premised his defense on a claim of suicide. Accordingly, a review of the other three points in the state's case is appropriate.
The fourth prong of the state's case was premised on the absence of fingerprints on the murder weapon. In support, the state presented at trial the testimony of John Hunt, Jr., a police officer with the city of Columbus for twenty-two years and a detective with the Detective Bureau, Crime Scene Search Unit. Hunt testified that he found no prints when he processed the murder weapon. At the trial court's evidentiary hearing on defendant's claim of ineffective assistance of counsel, defendant presented the testimony of Charles Conner, retired from the Bureau of Alcohol, Tobacco Firearms, regarding the lack of fingerprints on the murder weapon. Connor testified that he had success in lifting fingerprints off of firearms in eight to ten percent of the firearms he tested. On cross-examination, he admitted that it is "different * * * to say that you found no identifiable latent prints and that you found no prints whatsoever * * *." (Tr. 18.) On redirect, defense counsel then asked: "If you were to say no prints on a firearm, what would you mean?" (Tr. 20.) Connor replied, "[t]here was no prints, period, on the firearm, no smudges, no nothing." Id. As a result, Connor in the end confirmed the testimony of Hunt that the murder weapon, free of prints, did not even have smudges. Such evidence undercuts the probability of suicide.
The remainder of the evidence in the record was before this court on direct appeal. At that time, the ineffectiveness of defense counsel was raised as an assigned error and overruled. Nonetheless, we examine the evidence to determine whether that evidence, reviewed in the light of evidence presented at the evidentiary hearing on defendant's post-conviction relief petition, may support a finding that the outcome of the trial probably would have been different.
The second prong of the state's case asserted the decedent's body was arranged after death to appear as a suicide. In support, the state presented at trial the testimony of Herbert MacDonnell, director of the laboratory of Forensic Science, which he characterized as an independent laboratory available to both the prosecution and the defense in criminal cases, but also available for civil cases. He testified the decedent's arm was raised after the blood surrounding the arm had clotted. He further noted blood swipes across the body.
Through the testimony of the investigating officer, defendant offered at trial an explanation of the events immediately following the gunshot. Defendant told the officer that he "tried to save her, because he was a medic in Vietnam, and that he had pulled her hand away from her face and touched her neck for a pulse, and that was the extent of his moving the body." (Tr. Vol. I, 172.)
While defendant's version may explain the break in the clotting, it does not adequately explain the blood swipes in view of MacDonnell's testimony that "the kind of material that made this [the blood swipes] is very unlikely fingers. Fingers are impossible to have done this. The heel of your hand possibly, if it was done in a uniform manner. I would say porous material like a cleenex [sic] or towel, or something that will hold blood, and the blood source came from under the revolver. So it is my conclusion that whatever created this wiping and swiping motion occurred — came either under the revolver in one motion or the revolver was placed there after this action took place. The latter does not make very much sense to me, the former does." (Tr. Vol. II, 103.) Supporting MacDonnell's testimony, the evidence showed that the decedent owned a gun wrapped in a cloth which was kept under the sofa where defendant said he had been watching television just before the shooting. The foregoing uncontradicted testimony is inconsistent with suicide.
Finally, addressing the third prong of the state's case, which maintained the murder weapon was fired from a distance of more than two feet, defendant notes the testimony of Keith Norton, M.D., of the Franklin County Coroner's office, who classified the darkened ring around the gunshot wound as soot, a common residue from a close-range gunshot. Dr. Norton, however, did not test for soot. Rather, he believed the ring to be soot, in part because he initially believed, based on preliminary police reports, that the decedent had committed suicide. Moreover, although defendant suggested in the first appeal arising from his request for post-conviction relief that he had additional evidence on the issue, defendant on remand failed to present evidence regarding the lack of stellate pattern around the gunshot wound, and the significance it bore to the distance from which the gun was fired. While defendant presented a treatise, that is not appropriate evidence, and thus does not advance his petition.
In a final effort to show a probability of a different outcome on retrial, defendant also notes the testimony of Dr. Norton, who originally classified decedent's death as a suicide but later changed the ruling to homicide. Defendant contends Norton's equivocation allows the jury to conclude that his original assessment was appropriate. Norton, however, explained that he did not examine the body by autopsy because no autopsy was ordered for the body when it was sent to the morgue. Norton candidly admitted that by his observation of the body, he was unable to ascertain whether the death was by suicide or by homicide. Rather, he classified the death as a suicide because the police information at that time suggested suicide. As the forensic information from the police department changed, Norton also changed his opinion from suicide to homicide. He consistently maintained the cause of death was a gunshot wound to the head.
In the final analysis, the testimony of Dr. Staubus undermines the state's contention that suicide was impossible due to the victim's unconsciousness at the time of her death. Even with Dr. Staubus' testimony, however, suicide may still be impossible due to natural sleep. Nonetheless, were the victim's unconsciousness the only determinative factor in assessing defendant's guilt, a new trial might be warranted. The other three prongs of the state's case, however, cannot be ignored. For none of those points does the defendant, either through material presented at the evidentiary hearing on his post-conviction relief petition or in the original trial, present a persuasive exculpatory scenario. As a result, we are unable to conclude that, even with the testimony of Dr. Staubus and Connor, the outcome of the trial probably would have been different. Accordingly, we are compelled to overrule defendant's single assignment of error and affirm the judgment of the trial court.
KENNEDY and McCORMAC, JJ., concur.
McCORMAC, J., retired, of the Tenth Appellate District, assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution.