Defendant-appellant, Redan R. Norman, appeals from the judgment of the Franklin County Court of Common Pleas convicting him of the aggravated murder and kidnapping of Kaleb Williams. For the reasons that follow, we affirm.
On May 14, 1998, appellant was indicted on one count of aggravated murder, alleging that appellant purposely killed the victim during the course of a kidnapping, one count of aggravated murder with prior calculation and design committed during the course of a kidnapping, and one count of kidnapping. Each count carried a firearm specification.
A jury trial began on January 21, 1999. During the course of the proceedings, the second count was amended to reflect a charge of aggravated murder with prior calculation and design, without a capital specification. On January 28, 1999, the jury found appellant guilty of all counts and specifications. Appellant filed a motion for a new trial on February 5, 1999.
The mitigation phase of the capital trial began on February 10, 1999. On February 14, 1999, the jury recommended a sentence of life in prison with no possibility of parole, and the trial court sentenced appellant in accordance with the jury's recommendation. The trial court overruled appellant's motion for a new trial on March 15, 1999. Appellant filed a timely notice of appeal.
At trial, the prosecution presented evidence that, on May 3, 1998, the victim, Kaleb Williams, and Arlynda Heard visited appellant and his girlfriend, Amy Gill, at appellant's home. Heard testified that, earlier that day, she had met with Williams to talk about their son. Heard and Williams stopped at Innis Park to talk and then rode around for a while prior to arriving at appellant's house. Heard testified that appellant was a good friend of hers, "like my best friend." Heard testified that, when they got to the house, appellant and Gill were there. She stated that they introduced Kaleb to appellant and they were all "just sitting around drinking." (Tr. 32.)
At some point in the evening, Williams lost his temper with Heard, grabbed her by the neck and started choking her. After Williams let go, Heard asked appellant to ask Williams to stop choking her. Appellant intervened, and things returned to normal. About twenty minutes later, Donald Anderson, a friend of appellant's, knocked at the door. Heard answered the door and Anderson and Williams immediately exchanged words. According to Heard, appellant then went upstairs and came back downstairs with a gun. Heard testified that she and Williams were sitting on the couch and, when she saw the gun, she got up. She testified that appellant then pointed the gun and stated, "you see this, mother fucker" and then fired the gun. (Tr. 36.) Williams fell to his knees on the floor. Heard stated that Gill was in the kitchen at the time of the shooting.
About a minute later, appellant and Anderson picked up Williams and carried him outside to appellant's car which appellant had pulled around to the carport. As Anderson and appellant were carrying Williams out, Heard said she noticed that Williams's stomach was still moving, and that it appeared to her that he was still breathing and alive. After appellant and Anderson left with Williams in the trunk of the car, Gill began trying to clean up blood stains on the carpet, in the kitchen, and on the back patio. Heard telephoned her husband to come and pick her up, but remained in the house until appellant and Williams returned. As she left, she picked up a spent .22 shell casing and a live .22 round and took them with her.
Heard would not tell her husband what was wrong, although she was crying. After Heard arrived home, she telephoned the police and told them that she had witnessed a murder.
On cross-examination, Heard testified that Williams had choked her hard enough to leave prints on her neck, her face turned red, and he cut-off her air supply. Heard also testified that, while Williams was lying on the floor, he never moved nor uttered a sound. Heard indicated that, prior to the shooting, Williams had been intoxicated and was angry and, particularly while he was choking Heard, he looked angry. Heard also stated that no one attempted to administer first aid, call 911, or check his pulse. After her husband arrived, they drove home separately. Heard indicated she had been home approximately an hour before she telephoned the police. Heard also stated that she told the police that she believed Williams was still alive when he was carried out of the house.
The state's next witness was William Lang, the first police officer on the scene. Lang identified the live round and shell casing that was turned over by Heard. Lang testified that, as he approached the house, he noticed some blood drippings on the patio and more drippings on the steps to the back porch. He also spotted a white Ford pulling away from the house with three occupants aboard.
The state's next witness was Mark Henson, a detective in the Crime Scene Search Unit, Columbus Division of Police. Henson identified a photograph log, a number of photographs, physical evidence that that was taken from the scene, and a white canvas tennis shoe, which had been recovered from a dumpster at the rear of appellant's home. The police also recovered a spring loaded feed tube used to load a .22 rifle. Henson identified a photograph that indicated a blood spot in the trunk of appellant's vehicle and also photographs showing blood smears on the rear of the vehicle.
Edward P. Breining, chief investigator with the Fairfield County Coroner's Office and a lieutenant with the Lancaster Fire Department, testified with respect to the victim's body, which was discovered at a remote location on Tussing Road. Breining testified that the victim was lying on his back in wet grass. There was some standing water around the body; one arm was over the victim's head. Breining noticed that one shoe was missing from the victim's body and that the victim had a white sock on. Breining detected no rigor mortis except for a small amount in a finger. He noticed a bloody foam-like material around the victim's mouth and nose. Breining testified that he had seen bloody foam, like the substance on the decedent's mouth, numerous times in live people that have congestive heart failure. He indicated that when a person is having heart failure, serum is pushed to the lining of the lung and, as the person breaths, it creates foam that the person coughs up. Breining also indicated that he had seen foam on the body of a deceased person. Breining attended the autopsy but, at that time when he viewed the body, the foam was gone.
Keith Norman Norton, M.D., a forensic pathologist and deputy coroner for Franklin County, testified next. Dr. Norton testified that Williams, who was six feet one inches tall and one hundred ninety-nine pounds, suffered a single gunshot wound that entered the left side of his neck and exited the back right side of his neck. The bullet struck the cervical spine, bruising the spinal cord, causing paralysis, and resulting in a cessation of breathing. The bullet traveled in a slightly upward direction from left to right and front to back. The cause of death was asphyxiation due to bruising of the spinal cord.
The coroner testified that a person with the type of injury such as the victim would be likely to die as a result of that injury unless they got prompt medical care. According to the coroner, the victim would need someone (or something) to breath for them for a period of time, at least until the spinal cord got better. Moreover, a person would not be able to walk as a result of the bruising, but there might be a period of time as the bruising developed that would allow the person to live for a period of time. A person sustaining this type of gunshot wound would be effectively paralyzed from the neck down. Without prompt medical attention, death could occur immediately or up to thirty minutes later. Within the first five minutes of sustaining the wound, the victim still could have been breathing. The coroner also testified that Williams had a blood alcohol level of .22 grams percent, and a metabolite of cocaine was found in the victim's urine.
Dr. Norton explained that the white foam-like substance around the victim's mouth was the result of pulmonary edema. He testified that when the lungs are not getting enough oxygen into the blood or there is not enough oxygen getting into the lungs, the body responds by pushing fluid out into the lungs. The fluid mixes with the air in the lungs and makes bubbles. As more fluid is pushed into the lungs, air bubbles rise up and come out as foam. As the windpipe fills up and fills up through the mouth, the foam comes out through the mouth. The coroner was not able to determine the time between the gunshot wound and death by asphyxiation. He believed breathing probably stopped within thirty minutes of the gunshot wound, but that was just his best estimation.
Detective Ross W. Young, Jr., was the primary homicide detective in charge of the investigation. Prior to Detective Young arriving at appellant's home, he monitored a radio dispatch indicating that a white Ford Taurus had been stopped nearby. Appellant, Amy Gill, and Donald Anderson were inside the car.
Later, Detective Young interviewed appellant at police headquarters at approximately 5:00 a.m. According to Young, appellant described the conflict that had developed that evening between Williams and Heard. Young testified that appellant stated that he believed that Williams was shot in the shoulder and that he and Anderson drove the body from the scene of the shooting. Appellant claimed that the victim was conscious and that he mumbled something at one point. Appellant also stated to Detective Young that Williams sat up after they removed him from the car. The detective videotaped the discussion in the police station and, after appellant agreed to take the detective to the body, Detective Young recorded some further exchanges on a cassette recorder. The portion of the recording consisting of the conversation on the way to the body was played to the jury, but the trial court did not permit the second part of the tape containing the detective's impressions at the scene to be played for the jury.
Detective Young further testified that the body was found in a remote area near a water treatment plant. Detective Young noticed moisture about the face and a bubbling type of white foam or saliva coming out of his mouth and his nostrils. The victim's head was tilted towards his left and most of the foam seemed to be running out of the left side of his mouth. A medic called to the scene pronounced the victim dead at the scene. Detective Young also observed that the victim's extremities were cool to the touch and rigor mortis had not set in. The detective also testified that he put his hand toward the right side, close to the torso and armpit area, and that the victim still felt extremely warm in spite of the fact that he was lying in standing water. The outside temperature that morning was about fifty-two degrees. It had rained heavily the evening before.
On cross-examination, Detective Young admitted that none of his reports or recordings indicated that the body was extremely warm upon his arrival. The recording made at the scene further noted that the victim, who was missing a shoe, did not have a dirty sock. Detective Young surmised from this that it was unlikely that the victim moved from this position once he was placed there. The detective also commented on the tape that there would have been more blood in the water had the victim still been alive.
Appellant testified on his own behalf. Appellant testified that he had worked on May 3 from 8:00 a.m. until 8:00 p.m. After he arrived home, he began barbecuing in the backyard. Arlynda Heard and Kaleb Williams arrived about twenty minutes after appellant arrived home. Heard introduced Williams to appellant. Appellant testified that he did not see what he described as the first confrontation between Heard and the victim. Appellant stated that his girlfriend, Gill, told him of the confrontation, and he went into the house to see what was going on. At that point, he observed Heard snatch the front door open and, just as she did, Donald Anderson was at the front door getting ready to knock. This startled Heard, and Anderson made a joking remark (apparently about Heard) to which Williams took offense. As Anderson attempted to shake hands with Williams, Williams pushed Anderson into the area by the television. Then, according to appellant, Williams began to choke Heard. Appellant saw Heard's face turn colors and she began vomiting. Appellant tried to explain to Williams that Anderson was not romantically involved with Heard, but Williams did not respond. Appellant began yelling at Williams to let her go, but Williams had a "scary look," "a look like there was nobody there." (Tr. 301.) At that point, appellant testified that he retrieved his .22 rifle from behind the sofa. Appellant testified that Williams was still choking Heard and that he noticed Williams's arms starting to flex even more. Appellant screamed at Williams to let her go, brought the gun up higher, and pulled the trigger. The gun went off. Appellant did not believe the gun was loaded, but the next thing he saw was the victim fall to the floor. Appellant dropped the rifle, and his girlfriend came running out of the kitchen. Appellant testified that his girlfriend became hysterical, and appellant's mind went blank and he panicked. Appellant testified that Heard was still trying to gasp for air as a result of the choking and that Anderson was present in the room during the shooting.
Appellant took the victim's pulse and was not able to find a pulse. Appellant testified the body remained at his house for approximately twenty-five to thirty minutes while everyone was in a panic. Appellant testified that he became scared and that he and Heard went out the front door, got in the car, and brought it to the back of the house. Appellant testified there was a lot of blood and that he and Anderson took the victim out of the house, placed him face up in the trunk of the car, and drove out to Tussing Road where they disposed of the body. Appellant stated that he threw the rifle into a creek.
After appellant and Anderson returned home, Heard and her husband were there, as well as appellant's girlfriend. Appellant checked on his girlfriend and decided to turn himself in to the police. Appellant went to his brother's house to talk to his brother prior to turning himself in. After he left his brother's house and was on his way home, the police picked him up at approximately 1:00 a.m.
Appellant testified that he had lied to the police about Williams being alive. Appellant testified that the police told him that if the body were still alive he would only be charged with felonious assault. Appellant admitted that it was not true that the victim sat up. Appellant explained his reason for giving a false statement was that, if Williams were still alive, appellant would only be charged with a lesser offense. Appellant stated that, after the gun went off, the victim never made any sound or movement whatsoever.
On cross-examination, appellant indicated that Heard and he were good friends, that he had known her for about three years, and that she looked to him as an older brother. Appellant indicated that Heard's version of the events differed in several respects from his. Appellant stated that Heard never came to him to tell him about the first choking incident. He further indicated that, after Anderson came into the house, Heard and Williams did not sit back down on the couch. Appellant stated that Heard was mistaken when she testified that appellant had run upstairs to get the gun and that she was further mistaken as to where appellant was located at the time of the shooting. Appellant indicated that he checked Williams's pulse in the neck area. Appellant indicated that he had only one drink that evening. He stated that the shooting was an accident and that he did not mean to kill Williams. When asked if he meant to pull the trigger, appellant responded "I tried to get him off of her." Appellant then testified that he intended to injure Williams but did not want to kill him. He insisted that he did not know that the gun was loaded. Appellant indicated that he pulled the trigger to scare Williams and that he pulled the trigger "to make it click." Later in his testimony, appellant indicated that he did not mean to hurt Williams at all, but that he just wanted to get Williams to stop choking Heard. Appellant testified that he was scared for himself and for Heard. Appellant stated that the victim was in a rage, and that is why he used deadly force. Appellant stated that he did not look at the victim's face and, thus, he did not observe any foam or blood coming out of the victim's nose or mouth.
Gill corroborated appellant's version of the facts in most respects. Gill indicated, however, that she was not present in the room at the time of the shooting but that, just seconds before the gun went off, she heard appellant plead with the victim to let Heard go. She testified that there was "lots and lots of blood" and that Williams never moved or made any sound after he fell. She believed he was dead. She observed appellant check for a pulse, and she watched while appellant and Anderson took Williams out of the house. After appellant and Anderson took Williams out, she began cleaning up the blood.
On appeal, appellant has assigned as error the following:
FIRST ASSIGNMENT OF ERROR:
 There was insufficient evidence to establish by proof beyond a reasonable doubt that Appellant purposely killed another during the course of a kidnapping.
SECOND ASSIGNMENT OF ERROR:
 There was insufficient evidence to establish by proof beyond a reasonable doubt that Appellant committed the offense of kidnapping.
THIRD ASSIGNMENT OF ERROR:
 There was insufficient evidence to establish that Appellant acted with prior calculation and design.
FOURTH ASSIGNMENT OF ERROR:
 The jury erred in failing to find that defense of another was established by a preponderance of the evidence.
FIFTH ASSIGNMENT OF ERROR:
 Appellant was denied his right to a fair trial as a result of prosecutorial misconduct.
SIXTH ASSIGNMENT OF ERROR:
 The trial court erred in refusing to admit a taped statement made by Detective Young that was inconsistent with his in-court testimony and was the remaining portion of a tape that was played to the jury.
SEVENTH ASSIGNMENT OF ERROR:
 The trial court erred in failing to instruct on the defense of accident.
EIGHTH ASSIGNMENT OF ERROR:
 The trial court erred in giving confusing, incomplete, and inaccurate instructions on the charged offenses.
NINTH ASSIGNMENT OF ERROR:
 The trial court erred in giving a confusing and inaccurate instruction on defense of another.
TENTH ASSIGNMENT OF ERROR:
 Appellant was denied effective assistance of counsel as guaranteed under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution.
ELEVENTH ASSIGNMENT OF ERROR:
 The trial court erred in excluding testimony at the mitigation hearing indicating that the co-defendant had been acquitted of identical charges.
TWELFTH ASSIGNMENT OF ERROR:
 The trial court erred in failing to grant Appellant's motion for a new trial.
THIRTEENTH ASSIGNMENT OF ERROR:
 Appellant's convictions were against the manifest weight of the evidence. This denied Appellant a fair trial and due process of law as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution.
In his first assignment of error, appellant argues that, in order to be guilty of the conduct alleged in Count 1 of the indictment, the state had to prove that appellant purposely killed a kidnapped victim. Appellant argues that, in proving this offense, the state had to prove: (1) that appellant kidnapped Kaleb Williams; (2) knowing that he was alive; and (3) purposely caused his death; and (4) by abandoning him in another location. Appellant contends that this theory is inconsistent with the facts as presented at trial. Appellant argues there was no credible evidence that appellant knew that Williams was alive and, therefore, he could not be found guilty of felony murder during the course of a kidnapping.
Sufficiency of the evidence is the legal standard applied to determine whether the case should have gone to the jury. State v. Thompkins (1997), 78 Ohio St.3d 380, 386. In other words, sufficiency tests the adequacy of the evidence and asks whether the evidence introduced at trial is legally sufficient as a matter of law to support a verdict. Id. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus, following Jackson v. Virginia
(1979), 443 U.S. 307, 99 S.Ct. 2781. The verdict will not be disturbed unless the appellate court finds that reasonable minds could not reach the conclusion reached by the trier of fact.Jenks, supra, at 273. If the court determines that the evidence is insufficient as a matter of law, a judgment of acquittal must be entered for the defendant. See Thompkins, supra, at 387.
Count 1 of the indictment alleged a violation of R.C.2903.01(B), which provides as follows:
 No person shall purposely cause the death of another or the unlawful termination of another's pregnancy while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit kidnapping, rape, aggravated arson or arson, aggravated robbery or robbery, aggravated burglary or burglary, or escape.
The mental state "purposely" is defined in R.C.2901.22(A), in the following manner:
 A person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature.
Appellant has focused his argument on the second element set forth above, i.e., "knowing that he was alive." The testimony of the deputy coroner, Heard, and appellant himself, provided sufficient evidence to prove not only that Williams was alive at the time he was kidnapped but, also, that appellant believed that Williams was alive. While Heard's testimony differed from that of appellant and his girlfriend, Gill, the jury was entitled to disbelieve appellant and to believe Heard. Heard testified that she saw the victim's stomach move up and down after he was shot. The deputy coroner testified that even without immediate medical attention, a person receiving a wound such as Williams's could live for up to thirty minutes. The deputy coroner indicated that a person receiving such a wound could survive with immediate treatment.
Other evidence that the victim was alive after the shooting involved the bloody foam found around the victim's mouth and nose at the time the body was discovered. The jury could infer from the deputy coroner's testimony and that of Breining, that the evidence of pulmonary edema when the body was discovered indicated that the victim was still alive at the time the body was dumped.
Finally, we have appellant's own statements to Detective Young that the victim was conscious after the shooting, that at one time the victim mumbled something, and again that appellant saw the victim sit up after he had been taken from the trunk of the vehicle and placed at the scene where the victim was found. Appellant testified that he made these statements in the hope that the victim was still alive and also in the hope that appellant would be charged with a lesser offense. Although Williams's ability to sit up after being taken out of the house is inconsistent with the deputy coroner's testimony, the jury could have found from these statements that appellant believed that the victim was alive when he took his body to a remote location and dumped it.
We next address appellant's argument that there was not sufficient evidence in the record from which to find that appellant purposely caused Williams's death while committing a kidnapping.
Appellant argues that the purposeful act that caused Williams's death was the shooting that took place before the kidnapping. Thus, appellant believes the felony murder statute, which seeks to punish those who kill their victims during the course of other felonious activity, is inapplicable here. We disagree.
In State v. Williams (1996), 74 Ohio St.3d 569, paragraph one of the syllabus, the Ohio Supreme Court held that "[n]either the felony-murder statute nor Ohio case law requires the intent to commit a felony to precede the murder in order to find a defendant guilty of a felony-murder specification." InWilliams, the defendant killed one victim then attempted to rape that victim's wife. The court of appeals had reversed a felony-murder count based on the underlying felony of attempted rape, finding that there was no evidence to suggest that the defendant formed his intent to rape the victim prior to the time he inflicted his fatal assault on the victim's husband. The Ohio Supreme Court reversed, finding that the crimes of which the defendant was convicted occurred during one continuous incident. Thus, the killing did not have to occur at the same instant as the attempted rape, nor did the killing have to have been caused by the attempted rape. Rather, the murder of the husband was associated with the attempted rape of the wife as part of one continuous occurrence. Accordingly, the Ohio Supreme Court held that the defendant "should not be able to escape the felony-murder rule by claiming the rape was merely an afterthought." Id. at 577.
Here, construing the evidence in favor of the prosecution, Heard indicated appellant formulated the intent to kidnap within a minute of the shooting, when he and Anderson took Williams out to the car. The first assignment of error is not well-taken and is overruled.
In his second assignment of error, appellant argues there was insufficient evidence to establish that the victim was alive and, therefore, that a kidnapping occurred when the body was moved from the place where the victim was shot. Heard's testimony that the victim was moved approximately one minute after the shooting, coupled with the deputy coroner's testimony that the victim could have lived for thirty minutes after the shooting, and Heard's testimony that she saw the victim's stomach or chest area moving up and down while he was being carried out to the car is evidence from which the jury could find that appellant committed the offense of kidnapping. Moreover, the testimony that rigor mortis had not set in, the body was still warm in the armpit area at the time it was discovered, and bloody foam was present around the victim's mouth and nostrils is further indication that Williams was alive at the time he was moved. The second assignment of error is not well-taken and is overruled.
In his third assignment of error, appellant argues the evidence was insufficient to establish that he acted with prior calculation and design. Prior calculation and design to kill requires a scheme designed to implement a calculated decision to kill. State v. Awkal (1996), 76 Ohio St.3d 324. Neither the degree of care nor the length of time the offender takes to ponder the crime beforehand are critical factors in themselves in determining whether a defendant killed with prior calculation and design. Id. However, mere momentary deliberation is insufficient to constitute prior calculation and design to kill. Id.; State v.Cotton (1978), 56 Ohio St.2d 8, syllabus.
Here, Heard testified that the victim had stopped choking her and that she and the victim were seated on the couch when appellant returned from upstairs where he had gone to retrieve his gun. Then he pointed the gun at Williams and fired. Appellant's withdrawal from the confrontation to obtain a weapon was a sufficient lapse of time and provided sufficient opportunity to allow appellant to form a plan to carry out the purpose to kill. State v. Robbins (1979), 58 Ohio St.2d 74, 79. The third assignment of error is not well-taken and is overruled.
In the fourth assignment of error, appellant argues that the jury should have found that appellant acted in defense of Heard when he shot Williams. To establish defense of another, the defendant must prove by a preponderance of the evidence that: (1) the defendant had reasonable grounds to believe and an honest belief that the person defended was in imminent danger of death or great bodily harm and that the only means from escape from such danger was by the use of deadly force; (2) the person defended was not at fault in creating the situation giving rise to the death of the victim; and (3) the person defended did not violate any duty to retreat to avoid the danger. State v. Harris (Aug. 25, 1998), Franklin App. No. 97APA11-1506, unreported (1998 Opinions 3088).
Here, the evidence was such that if the jury believed Arlynda Heard, the choking incident had ended and she and the victim were merely sitting on the couch when appellant approached with the rifle. If the jury believed Heard's version of the events and disbelieved appellant's version of the events, they could not find that appellant had established the affirmative defense of defense of another. The fourth assignment of error is not well-taken and is overruled.
In the fifth assignment of error, appellant argues that prosecutorial misconduct deprived him of due process and a fair trial. Specifically, appellant asserts that Anderson, the person who helped dispose of the victim's body, was intimidated by threats from the state that he would face additional prosecution if he testified on behalf of appellant.
Threats from the state to prosecute a potential defense witness, thereby inducing a refusal to testify, have been held to deprive a defendant of a fair trial in violation of the Due Process Clause. See, generally, Annotation, "Admonitions Against Perjury or Threats to Prosecute Potential Defense Witness, Inducing Refusal to Testify, as Prejudicial Error," 88 ALR 4th 388 (1991). In some of these cases, the evidence showed that the prosecutor communicated the threats directly to the witness. In other cases, the evidence showed that the prosecutor communicated the threats to the witness's attorney, the defendant's attorney, or the trial judge. Id.
Here, Donald Anderson, in a previous trial, had been acquitted of charges of capital murder and kidnapping arising out of his participation in helping to dispose of Williams after he had been shot. Appellant attempted to call Anderson as a witness in both the guilt and penalty phases of the trial. When the defense called Anderson to the stand, he asserted his privilege against self-incrimination under the Fifth Amendment. The following exchange occurred outside the presence of the jury:
 MR. JANES: First of all, Your Honor, I would like to apologize to the court and make it clear to the court that I had no expectation whatsoever that this gentleman was going to take the attitude he is taking today. And I want the court to clearly understand.
 THE COURT: Okay. Mr. Sproat is here representing Mr. Anderson.
 So the record reflects, Mr. Anderson was tried on this case and was found not guilty of this case, and it's my understanding that the trial, basically the charges that are set forth in this indictment.
 And Mr. Sproat, would you advise me how he could possibly incriminate himself?
 MR. SPROAT: Your Honor, the situation — I would explain, I was called a short time ago to be present to be here today. I was advised that there could be the possibility of charges filed against my former client, continue to be my client, that charges could be tampering with evidence, abuse of a corpse, possibly obstruction of justice.
 I explained to my client that was a possibility and if he were to testify here today that that testimony could be used in any subsequent trial, that testimony could be used against him. He chose not to testify. Of course, those charges could be filed against him regardless of whether he testified too. I explained that all to my client.
 And I also explained it was my understanding that he would not be permitted to testify to certain events but then take the Fifth Amendment regarding other events that would have the all-or-nothing situation.
 And he said to me, although he would love to help his friend he cannot do an all or nothing.
 THE COURT: He testified in the other proceedings, didn't he?
MR. SPROAT: Not in our trial.
THE COURT: Oh, did he not testify in that trial?
MR. SPROAT: No, sir.
 THE WITNESS: I made it clear to the attorney last night as well that I would testify up to a point and that other point that would be his account of what happened. I would not substantiate, no, up to a point. I did tell him that.
 MR. SPROAT: I would like to add, sir, it's my understanding we are going forward today with the assumption that the trial which Mr. Anderson had was aggravated murder and he was acquitted for that, that would apply to no possibility of retrial for aggravated murder or any of the other lesser included offenses thereunder.
THE COURT: You know that can't happen.
MR. SPROAT: That would be double jeopardy.
 THE COURT: I have some difficulty believing that the State would be permitted on this factual scenario knowing what they knew at the time of the incident that charges were filed that they would be permitted to now come back and file new charges for abuse of a corpse. I don't know exactly what happened in that case. But I have some difficulty believing that. I don't want to prejudge that totally.
Is there any other comments you might have?
 MR. JANES: As I indicated to you, Judge, I am just shocked that we are at this posture. I had no idea. If I even suspected we were going to be here, we wouldn't have taken the approach we did.
 I agree with you. I can't represent this man. I don't intend or pretend to represent him. But I fully expected after our long, detailed conversation last night that he was, in fact, going to testify to all these matters today.
 MR. SPROAT: Your Honor, I only wish to state for Mr. Janes, Mr. Allen and Mr. Norman, I was simply called over here to assess my client of his rights and possibly consequences of various courses of action.
Mr. Anderson did I bear down you or force you?
 THE WITNESS: No. Just told me what possibly could happen as a result of any testifying today, that charges could be filed on me at a subsequent date.
 MR. SPROAT: You said to me you had been thinking about this before me even coming over.
THE WITNESS: Yes. Yes.
MR. JANES: Your Honor, would the court —
 THE COURT: Is that your position then, you don't want to discuss anything that took place that night or in this case dealing with this incident?
THE WITNESS: That's correct.
 MR. SPROAT: If I may, Your Honor, I don't believe that's exactly correct.
 THE WITNESS: He's right. I would like to testify up to the point where I feel it would be instrumental to him. I mean, those things I really want to bring across. But then it's a gray area when it gets to a certain point then I would be incriminating myself.
 And at that time point, I even told his investigator, and I thought I made that clear to him as well that night, he said your attorney is going to come and he's going to advise you of what you should do. But you can face such and such charge for this. And he went into the interview.
 And I was being cordial trying to help to the effect that I could. I thought I clearly at that point, I couldn't do it. I said I would have to take the Fifth or just tell them an outright lie. I couldn't do it.
 THE COURT: It's my understanding then he would like to testify up to the point of the shooting but he doesn't want to testify to anything after the shooting.
THE WITNESS: To the events after that.
 MR. SPROAT: He can testify to the events up to the shooting, but shortly thereafter but there were actions later on if he were to testify about them.
 THE WITNESS: Would incriminate me. I feel this. You told me that yourself. I had to weigh this. And I thought I made it clear. I didn't mean to come here and cause any confusion. I thought it was understood. I even tried to send a message to him. But we can't communicate in there. They had us separated.
 I just could not — at a certain point, I have to look out for myself. I couldn't incriminate myself like that. I really just couldn't. Certain events here that I feel has to be brought across in his defense. But to go over beyond that I'm putting myself at, I can't do it.
 MR. JANES: I'm not trying to confuse this worse than it already is. I would ask the court to consider in the interest of justice based on what you heard, the court consider allowing this gentleman to testify with some limited immunity.
 Because as I understand what he's saying is that he's ready, willing and able to tell the truth of what happened. But he is concerned about the State of Ohio pursuing him further. I further understood the court, who cannot represent him, but that you were having some difficulty in believing that the State would pursue additional charges other than perjury. Now, clearly, if the man commits perjury, that's outside what we are talking about.
MR. SPROAT: Correct.
 THE COURT: I was not questioning whether the State would. I said, I had some difficulty believing that the State could.
MR. JANES: That's what I mean.
 THE COURT: But I don't know the answer to that question. Mr. Sproat, obviously has advised his client that there is a risk involved. I don't know the nature of that risk and the extent of that risk.
MR. JANES: We wish to discuss —
 THE COURT: Because I don't know what he's going to say.
 MR. JANES: We wish to talk about what happened at the house. I assumed that if it went further than that, that it would go further than that. I certainly can't speak for Mr. Krapenc.
 If he were to be able to testify to the incident what happened at the house only, we would be more than happy to inquire only on that. But I don't think I'm in the position to dictate as to how far I can go and when I can stop. And I'm not trying to do that.
 THE COURT: What's the State's position on allowing him to testify up to the point of shooting and nothing afterwards?
 MR. BLAKE: We would be against it. There's so much important in this case which happens after the shooting that the jury is going to be wondering about, we are going to want to ask him about. I feel we have a right to ask him about what happened. It's important.
 THE COURT: This case is so interrelated with all the facts involved, not only the shooting, what happened at the shooting. As I said at the recess, the count is critical when the events happened.
 To have this witness testify partially would be inappropriate and not fair and I will not allow that to happen. [Tr. 280-287.]
The defense renewed its request to have Anderson testify during the mitigation phase of the trial, and he again exercised his privilege against self-incrimination. Anderson's new counsel proffered that Anderson did not wish to testify to any events that occurred after the shooting "because of the threats of prosecution that he received [through his defense attorney] or at least heperceived that he had received through his defense attorney by theprosecutors that he wouldn't go any further in this hearing and testify as to anything after that because he was afraid he was going to be exposed to indictment for obstructing justice, tampering with evidence and abuse of corpse." (Mitigation Hearing Tr. 99; emphasis added.)
Appellant argues that Anderson declined to testify because he was intimidated by the threat of additional prosecution and that it was not until after appellant called Anderson as a witness that the state informed Anderson that it was considering filing new charges. Appellant argues that the state's threats were baseless and improper, not only because they were made to intimidate a defense witness but, also, because any new charges would have violated Anderson's speedy trial rights. See State v.Meeker (1971), 26 Ohio St.2d 9 (right to a speedy trial is violated when the state has knowledge of the acts committed by a defendant but chooses to charge the defendant with only one crime and delays prosecution on other charges arising from the same set of facts).
The conduct of a prosecuting attorney during trial is not a ground for reversible error unless the conduct deprived the defendant of a fair trial. State v. Loza (1994), 71 Ohio St.3d 61,78. Based on the proffer, Anderson's testimony was highly relevant as it would have corroborated appellant's version of events concerning prior calculation and design, defense of another, and whether Williams was dead before he was moved. Appellant's allegation of prosecutorial misconduct, if true, would have denied appellant a fair trial and would constitute grounds for reversal of his conviction if the record contained evidence that the prosecution actually threatened Anderson, either directly or through his attorney with additional charges. However, we find that appellant's claim is not supported by the record before us.
Anderson indicated to the trial court that, before he was interviewed by appellant's investigator, the investigator informed Anderson that he could face certain charges. (Tr. 284.) Similarly, Anderson's counsel stated that he was advised that there could be the possibility of charges being filed against Anderson; however, Anderson's counsel never specified on record who had advised him of this possibility. (Tr. 280.) The proffer states that Anderson "was now not willing to risk going back to prison because of the threat that was in his view relayed from the prosecutors to [Anderson's then counsel]." (Mitigation Hearing Tr. 97; emphasis added.) Finally, Anderson's affidavit attached to the motion for a new trial merely indicates "I assumed that [Anderson's counsel] had talked to the prosecutors and that they had told him to tell me that I would be charged if I testified." (Affidavit at 2; emphasis added.)
Based on the record before us, appellant has not demonstrated that the prosecution intimidated or threatened him or otherwise engaged in misconduct warranting a new trial. Accordingly, the fifth assignment of error is not well-taken and is overruled.
In the sixth assignment of error, appellant argues the trial court erred in not admitting a portion of a taped statement made by Detective Young containing the detective's observations as he examined the body of the victim. The tape played for the jury contained part of a conversation between appellant and Detective Young as they drove to the body. The tape was then stopped. The portion of the tape that was not played for the jury was recorded later and contains Detective Young's observations at the scene. The tape indicates that the body was discovered at 5:38 a.m., and that the scene description of the victim's body was initiated at 8:52 a.m., "with the assistance of daylight." (Tr. of video and audiotape 27, 24.)
Appellant argues that the tape directly contradicts Detective Young's in-court testimony in several key respects. On the tape, Detective Young states "at the time of discovery at 5:38 AM, his body was cool to the touch. It was damp and wet." (Tr. of video and audiotape 27.) He also stated on the tape that the unsoiled right sock indicated the victim was likely dropped in the area and never was mobile. (Tr. of video and audiotape 27.) In addition, Detective Young states on the tape that, "had he been alive, it would seem that more blood would have been found in with the water." (Tr. of video and audiotape 28.)
In court, Detective Young testified that "his extremities were cool, his hands. * * * When I put my hand down towards his right side in close to the torso and armpit area he still felt extremely warm in spite of the fact that he was laying in standing water." (Tr. 196-197.) Detective Young did not recall saying, "had he been alive, more blood would have been found in with the water." (Tr. 231.) In court, Detective Young testified that "I don't know at what time he died. But I do believe that there's a strong probability that he was alive when he was there." (Tr. 232.) Detective Young indicated that "the amount of blood not found underneath the body is probably indicative of the water washing it away." (Tr. 232.)
Initially, the trial court did not allow appellant's counsel to ask Detective Young if he said certain things on the tape. The trial court indicated that the tape was a hearsay document but could be used for purposes of impeachment. (Tr. 229-230.) At trial, appellant argued the tape was admissible as a prior inconsistent statement. Appellant also sought to introduce the taped observations pursuant to Evid.R. 106 on the grounds that they represented the remainder of a tape played to the jury. The trial court disagreed, ruling that the tape could be used to refresh the recollection of the detective but would not be played to the jury unless the witness disputed its content. The tape was played for the detective outside the presence of the jury, and he testified that it did refresh his recollection. The detective then testified that he had in fact made the comment on the tape that there would have been more blood in the water had the victim been alive. (Tr. 240.) The detective also testified that, because the victim had one shoe on and one shoe off and had one clean white sock, he drew the conclusion that the victim likely had not moved prior to where he was found. (Tr. 239.)
Appellant later renewed his request to have the full tape played to the jury. After the jury instructions had been read to the jury, the trial court eventually informed the jury that the audiotape sent back for deliberations included a portion that had not been played at trial, and if they wanted to, they could consider it along with the other exhibits that had been introduced into evidence. (Tr. 550-551.)
The trial court is vested with broad discretion in the admission or exclusion of evidence. State v. Hymore (1967),9 Ohio St.2d 122. A trial court's ruling will not be overturned on appeal absent an affirmative showing that the trial court abused its discretion. Abuse of discretion being more than an error of judgment but a decision that is arbitrary, unconscionable, or clearly wrong. State v. Adams (1980), 62 Ohio St.2d 151. On appeal, appellant argues the tape should have been admitted as a present-sense exception to the hearsay rule; however, appellant did not make this argument at trial and, consequently, failed to preserve the argument except for plain error. See State v. Davis
(1964), 1 Ohio St.2d 28 (an objection on one ground does not preserve other grounds). To the extent appellant argues plain error, appellant must show that the outcome of the trial clearly would have been different but for the error. First, it is not clear that the tape recording qualifies as a present-sense impression (Evid.R. 803[1]), as the tape indicates that the body was discovered at approximately 5:30 a.m., but that the detective did not record his impressions until approximately 9:00 a.m., nearly three and one-half hours later. Second, appellant was able to get the pertinent statements in front of the jury, albeit in a somewhat qualified manner. Third, the tape was eventually sent back with the jury with the instruction that the jury could consider the tape along with the other exhibits. Accordingly, we fail to find plain error in the trial court's decision not to play the second part of the tape for the jury.
Appellant also argues that the tape should have been admitted under Evid.R. 106, since the first portion had been played to the jury. Evid.R. 106 provides:
 When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require him at that time to introduce any other part or any other writing or recorded statement which is otherwise admissible and which ought in fairness to be considered contemporaneously with it.
The rule explicitly states that it does not make admissible a writing or part thereof that is otherwise inadmissible. Appellant having failed to demonstrate how the recording was "otherwise admissible," the trial court did not abuse its discretion in failing to play the tape for the jury. The sixth assignment of error is not well-taken and is overruled.
In the seventh assignment of error, appellant argues the trial court erred in failing to instruct on the defense of accident. A reviewing court will not reverse a conviction in a criminal case due to jury instructions unless it is found that the jury instructions amount to prejudicial error. State v. DeHass
(1967), 10 Ohio St.2d 230, paragraph two of the syllabus. Jury instructions should outline the issues, state the applicable principles of law, and clarify the jury's role in the case. Bahmv. Pittsburgh Lake Erie Rd. Co. (1966), 6 Ohio St.2d 192. A jury instruction is proper when it adequately informs the jury of the law. Linden v. Bates Truck Lines, Inc. (1982), 4 Ohio App.3d 178.
The trial court has the responsibility to give all jury instructions that are relevant and necessary for the jury to weigh the evidence and make findings of fact. See State v. Comen
(1990), 50 Ohio St.3d 206, paragraph two of the syllabus; andState v. Lessin (1993), 67 Ohio St.3d 487. If appellant did not raise a timely objection with respect to a jury instruction, we must engage in a plain error analysis pursuant to Crim.R. 52(B). "Notice of plain error * * * is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." State v. Long (1978), 53 Ohio St.2d 91, paragraph three of the syllabus. Our inquiry under a plain error standard is whether, but for the purportedly erroneous instruction, the outcome of the trial clearly would have been different. Id., paragraph two of the syllabus.
In this case, defense counsel elected not to request an instruction on accident:
 THE COURT: By the way, I made the comment, is it an accurate statement you do not wish to have an instruction on accident?
[DEFENSE COUNSEL]: Correct. [Tr. 454.]
Appellant concedes that theories of accident and self-defense are generally inconsistent. In this case, however, he argues that his testimony contained elements of both defenses and, therefore, an instruction as to accident was warranted. Appellant is correct that his testimony contained elements of both defenses, but that is because his testimony was internally inconsistent. A defendant claiming accident denies a culpable mental state, while a defendant claiming self-defense concedes that he intended to commit the act, but asserts that he was justified in doing so. State v. Barnd (1993), 85 Ohio App.3d 254,260. Self-defense presumes intentional, willful use of force to repel force or escape force. Accidental force is exactly the contrary, wholly unintentional and unwillful. State v. Champion
(1924), 109 Ohio St. 281, 286-287.
In this case, appellant's account of the shooting was factually inconsistent with a theory of accident. At one point, appellant testified that he intended to injure the victim but not to kill him. (Tr. 334.) Later, he testified that he did not intend to injure the victim, that he just wanted to get him off of her, and that it was an accident. (Tr. 335.) Then appellant testified that he did not know the gun was loaded but that he intentionally pulled the trigger "to scare him," "to make it click." (Tr. 334-335.) Then appellant testified that he was scared for himself and for Heard, and that he thought the only way to stop the victim was to use deadly force. (Tr. 342.)
Appellant's testimony that he intentionally pulled the trigger with the thought that a click on an empty chamber would make the victim stop choking Heard borders on the incredible. A defendant has a right to request an instruction on accident or self-defense, but not both. Champion, supra, at 287. Defense counsel's decision to request an instruction on self-defense and not one on accident reflects a tactical decision to pursue a theory that would make sense to the jury. The seventh assignment of error is not well-taken and is overruled.
In the eighth assignment of error, appellant argues that the trial court gave confusing erroneous instructions with respect to Count 1 of the indictment, felony murder, and Count 2 of the indictment, aggravated murder. Appellant contends that, with respect to the charge of felony murder, the instruction did not inform the jury that the charge applies to a victim who is purposely killed during a kidnapping. Appellant argues that the trial court's instructions on felony murder separated the elements of a purposeful killing and the commission of a kidnapping and, thus, lacked the element that the offender purposely caused the victim's death during the commission of a felony.
We begin our analysis by noting that the record reflects that appellant approved of the instructions as given by the trial court. As noted by the court following the instruction conference:
 [THE COURT]: What we have agreed to is that since Count One alleges that the aggravated murder took place during the course of the kidnapping, we've agreed that Count One will deal with the kidnapping. If the jury makes the finding that the State has proved beyond a reasonable doubt that a kidnapping has occurred, thus the cause of death took place while the kidnapping took place or after the kidnapping took place, the jury will hear an aggravated murder charge with the specification dealing with Count One. [Tr. 450.]
Second, the trial court's instructions are not to be viewed in isolation but must be viewed as a whole. State v. Price
(1979), 60 Ohio St.2d 136, paragraph four of the syllabus. Here, the trial court informed the jury that "before you can find the defendant guilty, you must find that on or about May 3rd of 1998, in Franklin County, Ohio, that this defendant purposely caused the death of Mr. Kaleb Williams while committing or while fleeing immediately after committing the offense of kidnapping." (Tr. 526.) (See, also, Tr. 529, 541.) The trial court also instructed the jury that "the prosecution must prove beyond a reasonable doubt that the death occurred as a part of the acts occurring during or immediately after the kidnapping and the death must be directly associated with the kidnapping or the flight immediately after kidnapping." (Tr. 526-527.) This was consistent with the state's theory that the victim was alive when he was taken out of the house and later died either before his body was dumped or shortly thereafter. As discussed in connection with the first assignment of error, this was a correct statement of law.Williams, supra, at 577.
The trial court also instructed the jury that before it could find that a kidnapping occurred, the state must prove beyond a reasonable doubt that the victim was alive at the time of the offense. (Tr. 525-526.) Viewed as a whole, the instructions did not remove any elements from the consideration of the jury. The eighth assignment of error is not well-taken and is overruled.
In the ninth assignment of error, appellant argues that the trial court gave confusing and inaccurate instructions on the affirmative defense of defense of another. In particular, appellant argues that the trial court confused the jury by instructing that it must find that appellant did not violate any duty to retreat or avoid danger. However, the trial court went on to instruct that "[t]he law does not require a defendant to retreat outside of his own home. However, if he renews a fight that is broken off and did not attempt to avoid it or leave the scene even though that scene was his own home, he cannot claim the defense of defense of another." (Tr. 540.) The trial court's instruction informed the jury that appellant had no duty to retreat, but that he could not reinitiate a fight that was broken off and claim the defense of self defense. Thus, if Williams had stopped choking Heard at the time appellant used deadly force, he could not claim that he came to the defense of another. This was an accurate statement of the law and not in error and, consequently, the ninth assignment of error is not well-taken and is overruled.
In his tenth assignment of error, appellant contends that he is entitled to a new trial because he was deprived of his right to effective assistance of counsel according to the standards set forth in Strickland v. Washington (1984),466 U.S. 668. In particular, appellant contends that his counsel was ineffective because he submitted a confused defense theory that was based upon accident but in which no such instruction was requested, failed to object to impermissible evidence and argument from the prosecutor, and failed to object to incomplete and inaccurate instructions of the charged offenses and defense of another.
In order to prevail on his claim of ineffective assistance of counsel under Strickland, appellant must show that "counsel's performance fell below an objective standard of reasonableness and that prejudice arose from counsel's performance." State v. Reynolds (1998), 80 Ohio St.3d 670, 674. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland, at 686. Thus, a two-part test is necessary to examine such claims. First, appellant must show that counsel's performance was objectively deficient by producing evidence that counsel acted unreasonably.State v. Keith (1997), 79 Ohio St.3d 514, 534. Second, appellant must show that, but for counsel's errors, there is a reasonable probability that the results of the trial would be different. Id.
The burden of showing ineffective assistance of counsel is on the defendant. State v. Smith (1985), 17 Ohio St.3d 98. Trial counsel is entitled to a strong presumption that all decisions fall within the wide range of reasonable professional assistance. State v. Sallie (1998), 81 Ohio St.3d 673, 675. Tactical or strategic trial decisions, even if ultimately unsuccessful, do not generally constitute ineffective assistance.State v. Carter (1995), 72 Ohio St.3d 545, 558 ("Judicial scrutiny of counsel's performance is to be highly deferential, and reviewing courts must refrain from second-guessing the strategic decisions of trial counsel"); State v. Carpenter (1996),116 Ohio App.3d 615, 626 (court of appeals is to "presume that a broad range of choices, perhaps even disastrous ones, are made on the basis of tactical decisions and do not constitute ineffective assistance"). Applying these standards, we find that appellant has failed to show that his counsel was ineffective.
First, appellant claims his counsel was ineffective for failing to request an instruction on the defense of accident after appellant testified that the shooting was an accident. As discussed in connection with assignment of error seven, appellant gave inconsistent testimony regarding accident and defense of another. Because of appellant's confusing testimony, defense counsel's decision to request an instruction on defense of another appears to have been made for tactical or strategic reasons. Appellant admitted pointing a rifle at Williams and pulling the trigger "to get him off of her." (Tr. 334.) Defense counsel's decision to request an instruction on defense of another fit with defendant's version of the facts that the victim was choking Heard when appellant pulled the trigger.
Second, appellant claims his trial counsel was ineffective for failing to object to a portion of the state's closing argument in which the prosecutor argued that a photograph showed a nick on a stereo speaker that was possibly caused by a bullet fragment from the bullet that struck Williams when it exited his neck. The state argued that this possible nick was consistent with Heard's testimony that Williams was seated when he was shot, rather than standing and choking Heard as appellant testified. Appellant's counsel eventually objected that there was no evidence concerning any bullet fragments in the speaker or the flight of the bullet. Appellant acknowledges that the trial court sustained the objection but argues that the failure to enter a timely objection allowed the state to argue that physical evidence corroborated Heard's version of the events.
Both the defense and prosecution are given wide latitude in their arguments "as to what the evidence has shown and what reasonable inferences may be drawn therefrom." State v. Lott
(1990), 51 Ohio St.3d 160, 165. Here, the prosecutor was asking the jury to draw certain inferences from photographs that had been admitted into evidence. This was permissible closing argument.
Finally, appellant argues that his trial counsel was ineffective for failing to object to the jury instructions on the charged offenses and defense of another. As discussed in assignments of error eight and nine, the instructions were not prejudicial to appellant, no essential element of an offense was omitted, and the trial court properly instructed the jury that appellant did not have a duty to retreat from his own home but that he could not reinitiate a fight after it had broken off. The tenth assignment of error is not well-taken and is overruled.
In the eleventh assignment of error, appellant argues the trial court erred in excluding testimony at the mitigation hearing indicating that Donald Anderson had been acquitted of identical counts of capital murder, aggravated murder, and kidnapping. Appellant argues this information offered the defense a persuasive argument in support of leniency and was admissible under R.C. 2929.04(B)(7) (any other factors that are relevant to the issue of whether the offender should be sentenced to death). If relevant at all, this evidence would be admissible only on the issue of residual doubt. The purpose for admitting the evidence would be to persuade the jury to second-guess its verdict of guilt. "Residual doubt is not an acceptable mitigating factor under R.C. 2929.04(B), since it is irrelevant to the issue of whether the defendant should be sentenced to death." State v.McGuire (1997), 80 Ohio St.3d 390, syllabus.
In his twelfth assignment of error, appellant argues the trial court abused its discretion in not granting his motion for a new trial. After the jury verdict in this case, appellant moved for a new trial on the grounds that the trial court erred in not admitting evidence that, just prior to the shooting, Williams had told appellant that he had just gotten out of prison. Appellant argues that this evidence should have been admitted as it was not being admitted for the truth of the matter asserted but, rather, to show appellant's state of mind and whether appellant had a bona fide fear that Williams would inflict great bodily injury or death. While this may have been a meritorious argument before the trial court, the record on appeal does not reflect that appellant ever raised this argument at trial.
Appellant also claims that the trial court erred in failing to play the remaining portion of an audiotape that was played in court. This argument has been addressed in connection with appellant's sixth assignment of error and, therefore, is not well-taken and is overruled.
Appellant also contends he should have been granted a new trial because the prosecution intimidated a key defense witness. As discussed in connection with assignment of error five, the record before us simply does not reflect that the prosecution made the threat that additional charges would be brought against Donald Anderson if he testified for the defense.
Finally, appellant argues that he should have been granted a new trial as the prosecution failed to introduce sufficient evidence of prior calculation and design. As discussed in connection with the third assignment of error, the state presented sufficient evidence on this issue. The twelfth assignment of error is not well-taken and is overruled.
In his thirteenth assignment of error, appellant argues that his convictions were against the manifest weight of the evidence.
Even though supported by sufficient evidence, a conviction may still be reversed as being against the manifest weight of the evidence. Thompkins, supra, at 387. In so doing, the court of appeals, sits as a "`thirteenth juror'" and after "`reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" Id. (quoting State v. Martin [1983], 20 Ohio App.3d 172,175); see, also, Columbus v. Henry (1995), 105 Ohio App.3d 545,547-548. Reversing a conviction as being against the manifest weight of the evidence should be reserved for only the most "`exceptional case in which the evidence weighs heavily against the conviction.'" Thompkins, supra, at 387.
As this court has previously stated "[w]hile the jury may take note of the inconsistencies and resolve or discount them accordingly, see [State v.] DeHass [(1967), 10 Ohio St.2d 230], such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence." State v.Nivens (May 28, 1996), Franklin App. No. 95APA09-1236, unreported (1996 Opinions 2053, 2058). It was within the province of the jury to make the credibility decisions in this case. See State v.Lakes (1964), 120 Ohio App. 213, 217 ("It is the province of the jury to determine where the truth probably lies from conflicting statements, not only of different witnesses but by the same witness"). See, also, State v. Harris (1991), 73 Ohio App.3d 57,63 (even though there was reason to doubt the credibility of the prosecution's chief witness, he was not so unbelievable as to render verdict against the manifest weight).
Based on our review of the entire record, weighing the evidence and all reasonable inferences, and considering the credibility of witnesses, we find no basis to believe that the jury clearly lost its way and created such a manifest miscarriage of justice that appellant's convictions must be reversed and a new trial ordered. The thirteenth assignment of error is not well-taken and is overruled.
Based on the foregoing, we overrule appellant's thirteen assignments of error, and affirm the judgment of the Franklin County Court of Common Pleas.
Judgment affirmed.
PETREE and BOWMAN, JJ., concur.