[Cite as *State v. Bell*, 2023-Ohio-277.]

| | | |
|---|---|---|
| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF MEDINA | ) | |

| | |
|---|---|
| STATE OF OHIO | C.A. No. 21CA0052-M |
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| GARY BELL | COURT OF COMMON PLEAS COUNTY OF MEDINA, OHIO |
| Appellant | CASE No. 20CR0829 |

DECISION AND JOURNAL ENTRY

Dated: January 31, 2023

CARR, Judge.

{¶1} Appellant, Gary Bell, appeals the judgment of the Medina County Court of Common Pleas. This Court affirms.

I.

{¶2} On the evening of November 6, 2020, Bell's wife ("Wife") called 9-1-1 after Bell fired a gun in the family's house in Seville. The incident occurred after Bell and Wife had an argument.

{¶3} The Medina County Grand Jury indicted Bell on two counts of felonious assault in violation of R.C. 2903.11(A)(2)/(D)(1)(a). Both counts contained firearm and forfeiture specifications. Bell pleaded not guilty to the charges at arraignment.

{¶4} The matter was ultimately tried to the bench. The trial court found Bell guilty of both counts of felonious assault as well as the attendant specifications and imposed a total prison sentence of five years. Bell was ordered to forfeit the handgun used during the incident.

{¶5}    On appeal, Bell raises three assignments of error.  This Court consolidates certain assignments of error to facilitate review.

II.

**ASSIGNMENT OF ERROR I**

THE TRIAL COURT'S JUDGMENT OF GUILTY IS NOT SUPPORTED BY SUFFICIENT EVIDENCE.

**ASSIGNMENT OF ERROR II**

THE TRIAL COURT'S JUDGMENT OF GUILTY IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶6}    In his first assignment of error, Bell contends that his convictions were not supported by sufficient evidence.  In his second assignment of error, Bell argues that his convictions were against the weight of the evidence.

{¶7}    Bell was convicted of two counts of felonious assault in violation of R.C. 2903.11(A)(2), which states, "[n]o person shall knowingly * * * [c]ause or attempt to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance."  R.C. 2903.11(D)(1)(a) provides that a violation of this section is a felony of the second degree.

{¶8}    R.C. 2901.22(B) defines "knowingly" as follows:

A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature.  A person has knowledge of circumstances when the person is aware that such circumstances probably exist.  When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact.

Sufficiency

{¶9}    In support of his sufficiency challenge, Bell contends that the State failed to demonstrate that he knowingly attempted to cause physical harm to Wife.  Bell argues that there was no evidence that he ever pointed or aimed the gun at Wife or that Wife was in the path of

either bullet fired by Bell. Bell further points to the Ohio Supreme Court's decision in *State v. Mills*, 62 Ohio St.3d 357 (1992), in support of the proposition that a conviction for felonious assault cannot be sustained when the State fails to demonstrate that the alleged victim was in the line of fire.

{¶10} When reviewing the sufficiency of the evidence, this Court must review the evidence in a light most favorable to the prosecution to determine whether the evidence before the trial court was sufficient to sustain a conviction. *State v. Jenks*, 61 Ohio St.3d 259, 279 (1991).

> An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

*Id.* at paragraph two of the syllabus.

{¶11} On November 6, 2020, at approximately 8:30 p.m., Sgt. Brett Harrison of the Montville Police Department was on patrol when he was informed that Wife called 9-1-1 after Bell fired a gun in their house. Sgt. Harrison and several other officers responded to the scene. Wife remained on the line with dispatch after reporting the incident and was instructed to walk to the end of the driveway where the officers were located. Wife, who appeared upset and scared, explained that she had a heated argument with Bell after he came home late from work. Sgt. Harrison testified that, "[Wife] said during the argument she got tired of listening to him, so she went into the [master] bedroom and closed the door. She said then [Bell] went into the spare bedroom." Separating into the bedrooms in this manner was common practice for the couple during arguments. Wife could hear Bell yelling in the spare bedroom. Wife told Sgt. Harrison that she was standing near her bed when she heard a gunshot. Wife further told Sgt. Harrison that

she locked the bedroom door and entered the bathroom, where she hid in the bathtub and heard a second gunshot. Wife then called 9-1-1.

{¶12} The couple's adult son ("Son") remained in the house during Wife's conversation with Sgt. Harrison. Soon thereafter, Wife called Son and he proceeded to exit the house as well. Son indicated that Bell was in bed in the spare bedroom.

{¶13} At that point four officers approached the house. One of the officers was a neighbor who had Bell's cell phone number. Bell was eventually persuaded to come out of the house. After being taken into custody and receiving *Miranda* warnings, Bell indicated that the gun was inside the dresser located in the spare bedroom. The officers entered the house and conducted a search after obtaining consent from Wife. The officers were able to recover the gun. Bell was taken to the police station where he consented to be interviewed. Bell stated that he had fired the gun by accident. During the couple's argument, Wife accused Bell of marital infidelity. Bell indicated that he went into the spare bedroom before Wife entered the master bedroom. At one point during the interview, Bell stated that he "kn[e]w [Wife] just wanted to go into her bedroom and be alone" and that was when he pulled out his gun and "made a mistake[.]" Bell later suggested that he was not certain that Wife was in the bedroom but he "would assume" so because she "always" enters the bedroom when she is upset. Bell indicated that he did not know he fired two shots until he looked at the wall. Bell acknowledged that the gunshots travelled through the wall in the direction of Wife's bedroom. After the shots were fired, Bell immediately went to the master bedroom door and called out to Wife to check on her.

{¶14}  Sgt. Cory Searle conducted an interview with Wife that was recorded on his body camera.[1]  Wife told Sgt. Searle that the couple's argument focused on the number of hours that Bell was working.  Wife said that when she grew tired of the argument, she went into her bedroom hoping Bell would calm himself down.  Wife indicated that Bell knew she was in the bedroom.  After the couple dispersed into separate bedrooms, Wife heard the first gunshot.  Wife indicated that there was a delay between the shots.  Though Bell had made comments about suicide in the past, Wife did not think Bell had shot himself.  Sgt. Searle sought a deeper understanding of Wife's thoughts as the incident unfolded.  In recalling Wife's description of the situation, Sgt. Searle testified as follows:

> I thought at the time that a reasonable person would assume that somebody had committed suicide with a single gunshot.  She said that was not her initial thought, and quite to the contrary, she sought cover in the en-suite master bathroom in the bathtub before she heard the second shot.

{¶15}  During the investigation, the officers took a large number of photographs that were admitted as exhibits at trial.  The State also admitted a diagram of the floorplan of the house, a one-story ranch.  The photos demonstrated that two shots were fired from the spare bedroom.  One shot travelled on a downward trajectory through the wall of the spare bedroom and then through the master bathroom where it lodged in a wall near the toilet paper holder.  This bullet was located in the interior wall separating the master bathroom and master bedroom approximately nine inches above the floor.  The second bullet was fired at a slightly upward trajectory through the wall where it then passed through the master bathroom and into the master

---

[1] The interview was played at trial during the cross-examination of Sgt. Searle.  It appears from the transcript that while the audio recording of the interview was working, the video froze at certain points.

bedroom where it shattered a sliding-glass door. The bullet struck the sliding-glass door approximately 72 inches above the floor.

{¶16} Under these circumstances, Bell's sufficiency challenge is without merit. The State presented evidence that Bell grew angry after an intense argument where Wife accused him of marital infidelity. Wife stated at the scene that she walked away from the conversation and into the master bedroom. Wife further indicated that Bell knew she was in the master bedroom. Bell walked into a spare bedroom where there was a gun. Bell fired two gunshots in the direction of the master bedroom room where Wife was located. Bell stated in his interview with police that he knew Wife wanted to go into her bedroom and be alone. Though Bell later stated that he was not certain of Wife's location, he indicated that he assumed that Wife was in the bedroom. The evidence further showed that Wife took cover in the bathtub after hearing a gunshot. Wife indicated that the second shot was not fired until she was in the bathroom. This evidence, when construed in the light most favorable to the State, was sufficient to demonstrate that Bell knowingly attempted to cause physical harm to wife.

{¶17} Furthermore, Bell's reliance on the Ohio Supreme Court's decision in *Mills* is not well taken. *Mills* involved a bank robbery where the defendant was convicted of a number of serious crimes, including three counts of felonious assault involving three separate victims who worked as tellers at the bank. *Mills*, 62 Ohio St.3d 357-360, 369. Mills entered the bank and fired a gunshot that struck the counter in front of two tellers. *Id*. at 357. The Supreme Court concluded that there was sufficient evidence to sustain felonious assault convictions in regard to two of the three tellers, noting that "[Mills] actually fired a shot at the outset, hit [the first teller] over the head with a gun, and held a gun to [the second teller's] head." *Id*. at 369. In determining that there was not sufficient evidence to sustain a conviction with respect to the third teller, the Supreme Court

observed that "[w]hen the initial shot was fired, [the third teller] was standing near a desk located behind the teller counter and off to one side. She was not in the line of fire when the gunman entered and hid underneath her desk during the remainder of the robbery." *Id.*

{¶18} Unlike the bank robbery scenario in *Mills* where there were multiple alleged victims, the instant case concerns a domestic dispute involving only Bell and Wife. The State demonstrated that Bell fired two gunshots in the direction of the room where Wife was located. While the third teller in *Mills* was out of the way of the gunshot and thus "not in the line of fire[,]" the same cannot be said in this case. *Id.* Here, the State presented evidence demonstrating that Bell fired the shots either knowing Wife was located in the master bedroom or, at a minimum, while operating under the assumption that Wife was in that bedroom. Accordingly, the evidence does not support Bell's assertion that his convictions must be reversed under the authority of *Mills*.

{¶19} Bell's first assignment of error is overruled.

<u>Manifest Weight of the Evidence</u>

{¶20} Bell's manifest weight argument largely mirrors his sufficiency challenge. Bell maintains that the weight of the evidence supports the conclusion that he did not know Wife was in the master bathroom at the time the shots were fired, and that Wife was never in the path of either bullet.

{¶21} A conviction that is supported by sufficient evidence may still be found to be against the manifest weight of the evidence. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997); *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 12.

> In determining whether a criminal conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986).

{¶22} At trial, Bell testified that he and Wife had been married for 29 years and had two children together. Around the time of the incident, Bell was working between 65 and 80 hours per week and he was under a tremendous amount of stress. Bell had recently turned down an opportunity to purchase the business and his relationship with new ownership was strained. Bell further indicated that he suffers from restless leg syndrome, and, at the time of the incident, he had recently stopped using kratom, a drug he took to calm himself at night.

{¶23} After a long day at work on November 6, 2020, Bell decided to take a different route home. Bell had driven his Mustang that day, so he decided to take the highway. As he neared his house, Bell noticed Wife driving the other direction. Wife circled back and confronted Bell in the driveway. Wife had tracked Bell's location on her phone. Wife accused Bell of marital infidelity with a colleague. Bell testified that Wife was upset and slurring her words.

{¶24} Bell walked into the house and entered the spare bedroom. Bell testified that he entered the spare bedroom prior to Wife entering the master bedroom. Bell acknowledged that he was "ranting and raving" in the spare bedroom in light of the accusation of infidelity. Bell indicated at trial that he was "full of anxiety, full of guilt, and full of hate for myself." Bell testified that he pulled a gun out of the drawer with the intent of committing suicide. Bell further testified that when he put the gun to his head, he could not pull the trigger because he was a "coward." According to Bell, he then "turned and [] fired through the wall." Bell testified that he did not intend to fire a second shot, but the two shots went off in rapid succession. On cross-examination, Bell faced a line of questioning regarding his understanding of Wife's location at the time the shots were fired. Bell insisted that he entered the spare bedroom first and that he did not see Wife enter the master bedroom. Although Bell acknowledged that Wife "goes in the bedroom all the time[]"

and that it was normal for her to enter the bedroom after arguments, he "did not know for sure" that she was in the bedroom at the time the shots were fired.

{¶25} After hearing gunshots, Son entered the room to see what had happened. Bell and Son went to the door of the master bedroom to check on Wife. Wife responded that she had called 9-1-1.[2] Bell testified that he returned to the spare bedroom and took kratom. Bell then got in bed and pulled the covers over his head. Bell admitted at trial that he lied during his initial interview with police when he said the shots went off by accident. Bell suggested that he was under the influence of kratom at the time of the interview.

{¶26} Ray Barnwell testified as a forensic expert on behalf of Bell at trial. Barnwell testified that he was operating on the assumption that the two shots were fired in rapid succession based on Bell's interview with police. Barnwell did not conduct an independent interview with Bell. Barnwell used laser technology to track the trajectory of the bullets. Barnwell testified that the first shot traveled downward at an angle of 58 degrees while the second shot was fired upward at an angle of 93 degrees. Barnwell explained that if the shots were fired in rapid succession, then the downward shot necessarily would have been fired first. Barnwell testified that the fact that the second shot was upward and slightly to the right was consistent with the notion that the shots were fired in rapid succession. Barnwell explained that an inadvertent "double tap" second shot was a possibility given the particular handgun at issue. On cross-examination, Barnwell was asked if he had any reason to dispute Wife's initial statement that the first shot was fired while she was in the master bedroom and the second shot was not fired until she had made her way into the master

---

[2] The 9-1-1 call was played at trial. A review of the call does not support Bell's testimony that Wife told Bell and Son that she had called 9-1-1. Wife was incredibly distraught during the course of the call. Wife told the dispatcher that she thought Bell fired the shots on purpose and that she did not want to exit the room until police had arrived.

bathroom. Barnwell responded in the negative and said that issue was beyond his area of expertise. However, Barnwell noted his belief that the angle of the second shot was not natural for an intentional shot, which supported his opinion that the second shot was fired inadvertently.

{¶27} Significant portions of Wife's testimony varied from her statements to police at the scene. Although Wife initially indicated that she was upset because Bell came home late from work, she testified that she was using an application on her phone to track Bell's location and noticed that Bell was in the vicinity of a hotel. Wife testified that she had consumed two margaritas and her mind went "haywire." Wife decided to get in her car and find Bell but she passed him on the road just a short distance from their house. Soon thereafter, Wife confronted Bell in the driveway and accused him of infidelity.

{¶28} Wife and Bell engaged in an argument where both sides were very angry. Wife testified that she "basically said I had enough. And [Bell] did the same." Bell entered the spare bedroom and Wife entered the master bedroom. At trial, Wife stated, "I went back into my bedroom, but it was actually the master bathroom because I kind of think of that as just one unit. My go-to place when I get upset is to sit on the garden tub in the master bathroom." While Wife initially told police that she heard the first shot while standing near the bed in the master bedroom, and then a second shot moments later after she had entered the bathroom, she offered a different version of events at trial. Wife testified that, when she heard gunshots, she was thinking about opening the sliding-glass door in the bedroom, but she was actually still in the bathroom. Wife also testified that she heard a "[b]ang, bang[,]" meaning there was not a delay between the shots. Wife acknowledged that her testimony differed from her statements to police. Wife indicated that she was traumatized at the time of the incident and that she was acting out of self-preservation. At

the time, Wife feared Bell had snapped. Son similarly testified that he ran into the spare bedroom to check on Bell after hearing a "bang."

{¶29} On the date of the incident Wife told Sgt. Harrison that Bell had never threatened her during the course of their marriage. Wife reiterated this statement at trial and testified that she did not believe that Bell was shooting at her. Wife testified that Bell had been a loving Husband for 29 years and that he was simply under a great deal of stress. Wife read her written police statement into the record during her testimony. In her statement, Wife indicated that she walked away from the argument with Bell and into her bedroom. Wife's description of the sequence of events in her statements suggested there was a delay between the gunshots. On cross-examination, Wife reiterated that she made misstatements at the scene because she had been drinking and she had experienced a traumatic event.

{¶30} A thorough review of the record does not support Bell's contention that this is the exceptional case where the trier of fact clearly lost its way. Many of the critical factual issues in this appeal turn on credibility determinations. From the date of the incident to trial, Wife changed her story in a number of significant ways, including with respect to her location when the shots were fired and whether there was a delay between the shots. Bell also changed his story, perhaps most notably with respect to whether the shots were fired intentionally. We are mindful that "the trier of fact was in the best position to evaluate the credibility of witnesses, and this Court will not overturn the trial court's verdict on a manifest weight of the evidence challenge simply because the trial court chose to believe certain witnesses' testimony over the testimony of others." *State v. Thomas*, 9th Dist. Summit No. 26893, 2014-Ohio-2920, ¶ 20, quoting *State v. Ross*, 9th Dist. Wayne No. 12CA0007, 2013-Ohio-522, ¶ 16. Accordingly, Bell has not demonstrated on appeal that his convictions resulted in a manifest miscarriage of justice.

{¶31} Bell's second assignment of error is overruled.

## ASSIGNMENT OF ERROR III

THE APPELLANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL AND DENIED HIS RIGHT TO A FAIR TRIAL WHEN TRIAL COUNSEL FAILED TO PROPERLY DIRECT EXAMINE AN EXPERT WITNESS WHOSE TESTIMONY WOULD HAVE CORROBORATED APPELLANT'S DEFENSE AND FAILED TO MAKE AN EFFECTIVE CLOSING ARGUMENT[.]

{¶32} In his third assignment of error, Bell argues that trial counsel rendered ineffective assistance. This Court disagrees.

{¶33} In order to prevail on a claim of ineffective assistance of counsel, Bell must show that "counsel's performance fell below an objective standard of reasonableness and that prejudice arose from counsel's performance." *State v. Reynolds*, 80 Ohio St.3d 670, 674 (1998), citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland* at 686. Thus, a two-prong test is necessary to examine such claims. First, Bell must show that counsel's performance was objectively deficient by producing evidence that counsel acted unreasonably. *State v. Keith*, 79 Ohio St.3d 514, 534 (1997), citing *Strickland* at 687. Second, Bell must demonstrate that but for counsel's errors, there is a reasonable probability that the result of the proceeding would have been different. *Strickland* at 694. This Court need not address both prongs of the *Strickland* test if the appellant fails to satisfy either prong. *State v. Ray*, 9th Dist. Summit No. 22459, 2005-Ohio-4941, ¶ 10.

{¶34} Bell contends that trial counsel rendered ineffective assistance by not engaging in a more rigorous examination of defense expert Ray Barnwell. Bell suggests that trial counsel should have questioned Barnwell regarding whether Wife was in the path of either bullet. Bell

further contends that trial counsel's closing argument was deficient because he neither mentioned Wife's testimony that Bell had never threatened her during their marriage, nor did he mention Bell's testimony that his only intent on the evening of the incident was to harm himself. Bell further contends that defense counsel should have focused more on the trajectory of the bullets as well as Barnwell's testimony that the second shot was not fired intentionally.

{¶35} Bell's argument regarding trial counsel's examination of Barnwell falls within the purview of trial strategy. "[T]here exists a strong presumption of the adequacy of counsel's performance, and that counsel's actions were sound trial tactics." *State v. Hoehn*, 9th Dist. Medina No. 03CA0076-M, 2004-Ohio-1419, ¶ 45. "[D]ebatable trial tactics do not give rise to a claim of ineffective assistance of counsel." *Id.* During his testimony, Barnwell expressed his view that while the first shot was fired intentionally, the second shot was fired inadvertently. Taking into account Bell's statement to police that the shots were fired in rapid succession, Barnwell opined that the first shot was fired in a downward direction while the second shot was fired in a slightly upward direction. As Wife's exact location at the time the shots were fired was a disputed issue at trial, and because Wife told police in her initial statement that there was a delay between the shots, it is plausible that trial counsel declined to elicit testimony regarding whether Wife was in the line of fire because he did not want to draw further attention to unfavorable evidence.

{¶36} Furthermore, Bell's claim with respect to trial counsel's closing argument is without merit. Tactical decisions regarding closing argument, including the length of closing argument, also fall within the realm of trial strategy. *State v. Smith*, 9th Dist. Summit No. 23542, 2007-Ohio-5119, ¶ 18. While trial counsel's closing argument in this case was brief, it emphasized the core defense theory that the State failed to demonstrate that Bell had the requisite intent to be convicted of felonious assault. "Counsel chose a strategy that proved ineffective, but the fact that

there was another and better strategy available does not amount to a breach of an essential duty to his client." *State v. Clayton*, 62 Ohio St.2d 45, 49 (1980).  Under these circumstances, we cannot say that Bell has demonstrated that trial counsel's performance was objectively deficient.

{¶37}  The third assignment of error is overruled.

### III.

{¶38}  Bell's assignments of error are overruled.  The judgment of the Medina County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Medina, State of Ohio, to carry this judgment into execution.  A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run.  App.R. 22(C).  The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

DONNA J. CARR
FOR THE COURT

TEODOSIO, P. J.
HENSAL, J.
CONCUR.


APPEARANCES:

DAVID C. SHELDON, Attorney at Law, for Appellant.

S. FORREST THOMPSON, Prosecuting Attorney, and VINCENT V. VIGLUICCI, Assistant Prosecuting Attorney, for Appellee.